# United States Court of Appeals
## For the First Circuit

No. 06-1152

UNITED STATES OF AMERICA,

Appellee,

v.

JACKSON NASCIMENTO,

Defendant, Appellant.

_____

No. 06-1153

UNITED STATES OF AMERICA,

Appellee,

v.

LANCE TALBERT,

Defendant, Appellant.

_____

No. 06-1154

UNITED STATES OF AMERICA,

Appellee,

v.

KAMAL LATTIMORE,

Defendant, Appellant.

_____

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Patti B. Saris, U.S. District Judge]

---

Before

Boudin, Chief Judge,
Selya, Senior Circuit Judge,
and Stafford,* Senior District Judge.

---

    Ryan M. Schiff, with whom John Salsberg and Salsberg & Schneider were on brief, for appellant Nascimento.
    Albert F. Cullen, Jr., with whom Law Office of Albert F. Cullen, Jr. was on brief, for appellant Talbert.
    Wayne R. Murphy, with whom Murphy & Associates was on brief, for appellant Lattimore.
    Michael A. Rotker, Attorney, United States Department of Justice (Criminal Division, Appellate Section), with whom Michael J. Sullivan, United States Attorney, Theodore B. Heinrich, Glenn A. MacKinlay, and Donald L. Cabell, Assistant United States Attorneys, were on brief, for appellee.

---

July 2, 2007

---

* Of the Eleventh Circuit, sitting by designation.

**SELYA**, **Senior Circuit Judge**.  The pivotal issue in this case concerns the application of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962, to a street gang engaged in violent, but noneconomic, criminal activity.  That issue possesses constitutional implications weighty enough to have led one of our sister circuits to fashion a special, more rigorous, version of RICO's statutory "affecting commerce" requirement for use in connection with defendants involved with enterprises that are engaged exclusively in noneconomic criminal activity.  See Waucaush v. United States, 380 F.3d 251, 256 (6th Cir. 2004).  Although we are reluctant to create a circuit split, we conclude, after grappling with this difficult question, that the normal requirements of the RICO statute apply to defendants involved with enterprises that are engaged only in noneconomic criminal activity.  Based on that conclusion and on our resolution of a golconda of other issues ably raised by highly competent counsel, we affirm the appellants' convictions.  The tale follows.

## I.

We begin with a brief synopsis of the facts.  We will embellish upon that synopsis as we reach and discuss particular issues.

In the mid-1990s, a group of youths of Cape Verdean ancestry routinely congregated around Wendover Street in the Dorchester section of Boston, Massachusetts.  In 1995, one of these

youths (Nardo Lopes) killed another (Bobby Mendes). Nardo then went into hiding; as of the time of trial in this case, he remained a fugitive from justice.

Nardo's brother, Augusto Lopes, was also a Wendover regular. Though he was incarcerated at the time of the Mendes slaying, he resolved upon his release from prison, in July of 1996, to kill the potential witnesses against his brother. That resolve extended to many of his old Wendover Street associates.

In late 1997, Augusto Lopes began associating with Manny Monteiro, who introduced him to a group of individuals whose base of operations was Stonehurst Street in Dorchester. Lopes's new friends were part of a street gang that controlled Stonehurst Street. He soon learned that Stonehurst members "had problems" with their Wendover counterparts. Although the source was never clearly established, the antagonism was real: during the period from 1998 to 2000, a wave of violence transpired in which Stonehurst members repeatedly shot at Wendover members and Wendover members retaliated in kind. Augusto Lopes was integrally involved in this cacophony of ongoing mayhem.

In September of 2004, a federal grand jury returned a thirty-three count superseding indictment naming thirteen defendants. Three of these defendants are appellants here. With respect to them, the flagship charge was that they had violated RICO through their membership in a racketeering enterprise:

Stonehurst. The indictment alleged that Stonehurst's primary purpose was "to shoot and kill members, associates, and perceived supporters of a rival gang in Boston known as Wendover."[1] To buttress this allegation, the indictment enumerated nearly two dozen instances of murder and assault with intent to kill purportedly committed by Stonehurst members.

Seven individuals, including all three appellants, were tried together on assorted charges stemming from their involvement with Stonehurst. Augusto Lopes became a government witness and testified against his former Stonehurst allies, as did two other cooperating witnesses (Marcelino Rodrigues and Jason Burgo). The government also adduced testimony from a number of other eye-witnesses about various shootings. Police testimony, ballistics evidence, and the like completed the prosecution's case.

Following a twenty-six day trial, four defendants were acquitted. The three appellants did not fare as well.

The jurors convicted one appellant, Jackson Nascimento, of racketeering, 18 U.S.C. § 1962(c), racketeering conspiracy, id. § 1962(d), conspiracy to commit murder in aid of racketeering in violation of the Violent Crimes in Aid of Racketeering statute

---

[1]The indictment also charged that another purpose of the enterprise was "to sell crack cocaine and marijuana." However, the evidence at trial indicated that while individual Stonehurst members had engaged in drug trafficking, Stonehurst itself had not. Accordingly, the trial judge ruled as a matter of law that there was insufficient evidence to prove that the Stonehurst enterprise engaged in drug dealing. We assume the correctness of this ruling.

(VICAR), id. § 1959(a)(5), a VICAR assault charge, id. § 1959(a)(3), and use of a firearm in the commission of a crime of violence, id. § 924(c). The racketeering conviction was supported by special findings to the effect that Nascimento had (i) shot Zilla DoCanto and (ii) conspired to murder members of Wendover. The jury rejected the government's contention that Nascimento had perpetrated a second shooting and acquitted him of a second count of violating 18 U.S.C. § 924(c).

The jurors convicted a second appellant, Lance Talbert, on a RICO conspiracy count, a substantive RICO count, and a count charging VICAR murder conspiracy. The jury found specially that Talbert had shot Wendover member Adiello DaRosa and had conspired to murder members of Wendover. The government also had charged Talbert with having engaged in another shooting but dropped those charges at the close of the evidence.

The jurors convicted the third appellant, Kamal Lattimore, on both a RICO conspiracy count and a substantive RICO count. However, the district court immediately granted a judgment of acquittal as to the latter count. The jury acquitted Lattimore of a firearms charge and of charges of VICAR assault and VICAR conspiracy.

Following the verdict, the appellants moved for judgments of acquittal or, in the alternative, new trials. See Fed. R. Crim. P. 29, 33. The district court denied these motions in full.

On December 15, 2005, the district court sentenced Nascimento to a 171-month incarcerative term, Talbert to a 57-month incarcerative term, and Lattimore to a 46-month incarcerative term. These timely appeals ensued.

## **II.**

Five elements must coalesce to make out a substantive RICO violation. The government must show: "(1) an enterprise existed; (2) the enterprise participated in or its activities affected interstate commerce; (3) the defendant was employed by or was associated with the enterprise; (4) the defendant conducted or participated in the conduct of the enterprise; (5) through a pattern of racketeering activity." United States v. Marino, 277 F.3d 11, 33 (1st Cir. 2002). The appellants challenge the sufficiency of the evidence on the first, second, and fifth elements.

VICAR, as well as RICO, is in play here. VICAR requires that a defendant have committed a crime of violence in return for something of pecuniary value from, or in order to advance or maintain his position within, an enterprise affecting interstate commerce that is engaging in a pattern of racketeering activity. 18 U.S.C. § 1959. Thus, a successful sufficiency challenge to the RICO convictions also will serve to undermine the VICAR convictions. Similarly, inasmuch as Nascimento's conviction under 18 U.S.C. § 924 was predicated on his having committed a VICAR

assault on Zilla DoCanto, that conviction will be nullified if the VICAR charge is found to be unsupportable.

Although the appellants' arguments come in a kaleidoscopic array of shapes and sizes (including frontal attacks on the sufficiency of the evidence, questions about statutory construction, constitutional challenges, and complaints about jury instructions), we organize our discussion thematically, element by element.

## A.

The first element of a RICO offense requires proof of the existence of an enterprise. The enterprise need not be a legitimate business or a form of organization sanctioned by state law. United States v. Turkette, 452 U.S. 576, 587 (1981). It "need only be a group of persons associated together for a common purpose of engaging in a criminal course of conduct." United States v. Connolly, 341 F.3d 16, 28 (1st Cir. 2003) (citations and internal quotation marks omitted).

Despite the absence of any requirement of formal sanction, the government nonetheless must prove that the enterprise existed in some coherent and cohesive form. Turkette, 452 U.S. at 583. It follows that the enterprise must have been an "ongoing organization" operating as a "continuous unit." Connolly, 341 F.3d at 25.

In all events, the enterprise must be distinct from the pattern of racketeering activity that constitutes the fifth, and final, element of a RICO offense. See Turkette, 452 U.S. at 583. An enterprise is chiefly distinguished from the pattern of racketeering activity by the fact that it possesses some goal or purpose more pervasive and more enduring than the instant gratification that can accrue from the successful completion of each particular criminal act. See Connolly, 341 F.3d at 25.

Here, the appellants argue that the government failed to present sufficient evidence of the existence of an enterprise or, alternatively, that the district court's jury instructions obscured the difference between RICO's "enterprise" and "pattern" elements. In a related vein, they argue that the government failed to prove that the enterprise was of sufficient duration vis-à-vis the time frame that was set forth in the indictment. We address these arguments sequentially.

### 1.

We first ponder the sufficiency of the government's evidence concerning the existence of the enterprise. With respect to this issue, we review the record de novo to determine whether, taking the evidence and all reasonable inferences therefrom in the light most hospitable to the government's theory of the case, a rational jury could find beyond a reasonable doubt that the

government had established the disputed element of the offense. See United States v. Cruz-Arroyo, 461 F.3d 69, 73 (1st Cir. 2006).

In attacking the sufficiency of the government's evidence anent the existence of an enterprise, the appellants point to testimony from various cooperating witnesses who described Stonehurst as a loose aggregation of friends that lacked colors, initiation rites, and a formal hierarchy. For example, Augusto Lopes testified that Stonehurst was "just a group" whose members "were all friends with each other, certain individuals acted out, and some individuals didn't do nothing at all." Similarly, Burgo said at one point that Stonehurst was "just a name." The appellants suggest that this testimony distinguishes this case from United States v. Patrick, 248 F.3d 11 (1st Cir. 2001), a case in which we upheld the application of RICO to a street gang that "had colors and signs, . . . had older members who instructed younger ones, its members referred to the gang as family, and it had 'sessions' where important decisions were made." Id. at 19.

We agree that the factors mentioned in Patrick are relevant to the question of whether a street gang constitutes an enterprise — but their presence or absence is not dispositive of the issue. Here, the government provided other testimony that could have prompted a jury reasonably to conclude that Stonehurst was an enterprise. After all, Stonehurst members used a shared cache of firearms that were regarded as property of the gang. The

weapons were handed around and used by several different Stonehurst members to shoot Wendover sympathizers. One erstwhile Stonehurst member, Rodrigues, testified that he had traveled to purchase weapons for "the group" and clarified that by "the group" he meant "Stonehurst."

In addition to testimony about Stonehurst's arsenal, the record contains testimony suggesting that Stonehurst members self-identified as belonging to an organization. Cooperating witnesses were able to identify precisely a wide variety of individuals as being associated with Stonehurst. The witnesses also displayed an ability to distinguish between members and friends.

Then, too, Stonehurst members kept tabs on one another and informed one another when things would be "hot" because of a recent shooting. They acted on behalf of one another by attempting to assassinate witnesses to each other's crimes. And, finally, members trained other members in the use of night vision goggles, binoculars, and police evasion tactics to enable them more efficiently to carry out their shared purpose of killing Wendover members.

Taking this evidence in the light most favorable to the government, we conclude, as did the district court, that even though Stonehurst lacked some of the accouterments of more structured street gangs, a rational jury could find that it had a sufficiently well-defined shape to constitute an enterprise in the

requisite sense. Stonehurst exhibited group cohesion over time; its membership pooled and shared resources; the individuals involved had a sense of belonging and self-identified as Stonehurst members; and the group had a well-honed set of goals. We think that this is enough, if barely, to constitute a RICO enterprise. See Connolly, 341 F.3d at 27.

## 2.

Talbert makes a related contention: that even if the evidence suffices to support a finding that Stonehurst was an enterprise, the district court's jury instructions were confusing. He directs his umbrage at the court's instruction that a RICO enterprise need not have an "ascertainable structure." As Talbert acknowledges, this instruction has been approved as good law in this circuit. See Patrick, 248 F.3d at 18.

Some challenges to jury instructions are reviewed for abuse of discretion. See, e.g., United States v. Perez, 299 F.3d 1, 5 (1st Cir. 2002). Others, however, assign error in, say, the nature of the elements of an offense. That type of claim engenders de novo review. See, e.g., Marino, 277 F.3d at 28; see also United States v. Figueroa-Encarnacíon, 343 F.3d 23, 29 (1st Cir. 2003) (noting the standard-of-review distinction). Because Talbert's challenge is rooted not in an abstract principle of law but in the trial court's choice of language, with a view to minimizing

potential juror confusion, the abuse of discretion standard governs our review.

Because the challenged instruction tracks an explicit holding of this court, Talbert starts at a considerable disadvantage. He insists, however, that where, as here, there is only "minimal" evidence of the existence of an enterprise, the trial court should avoid the topic of ascertainable structure altogether. In a close case, his thesis runs, such an instruction, though technically correct, promotes juror confusion.

This argument is untenable. When an instruction is pertinent to the issues submitted to the jury and constitutes an accurate statement of the law, it is hard to imagine any basis for a claim of error. See United States v. Keene, 341 F.3d 78, 83 (1st Cir. 2003). Here, moreover, the district court took great pains to emphasize that "[a]n enterprise is not merely a related assortment of criminal activities." Rather, the court said, "there must be some goal — a purpose of engaging in a course of conduct — beyond this isolated benefit that can come from the commission of each criminal act." The court also made clear that "[t]he enterprise element [of the offense] is different from the racketeering activity element." These instructions were pellucid as to the distinctions between the "enterprise" and "pattern" elements of the offense. We see no realistic possibility that they were a source

of juror confusion. Consequently, the district court did not abuse its discretion in charging the jury as it did.

**3.**

The appellants lodge a final objection to the finding that Stonehurst constituted an enterprise. This objection centers on the longevity of the enterprise. It is not a claim that Stonehurst's existence was too ephemeral to satisfy the minimum duration required by the RICO statute, see H.J. Inc. v. Nw. Bell Tel. Co., 492 U.S. 229, 242 (1989) (discussing the continuity requirement applicable to RICO enterprises), but rather a claim that the duration of Stonehurst's existence, as proven, fell short of the period suggested in the indictment.

The argument proceeds as follows. First, the appellants note that the indictment specified that the named defendants "[f]rom a time unknown, but at least by July 1996, until the date of the Indictment" — September 30, 2004 — "did unlawfully and knowingly conduct and participate, directly and indirectly, in the conduct of the affairs of the [e]nterprise, through a pattern of racketeering activity." They then point out that the district court told the jury, without objection, that in order to establish the enterprise element, the government had to prove that "the enterprise [had] continue[d] in essentially unchanged form during substantially the entire period alleged in the indictment" (emphasis supplied). Next, the appellants remind us that "when a

-14-

cause is submitted to the jury under an instruction, not patently incorrect or internally inconsistent, to which no timely objection has been lodged, the instruction becomes the law of the case." United States v. Gomes, 969 F.2d 1290, 1294 (1st Cir. 1992). The question then becomes — or so the appellants say — whether the government provided "evidence sufficient to establish the elements required by the actual instructions given." United States v. Zanghi, 189 F.3d 71, 79 (1st Cir. 1999). The appellants conclude that this question must be answered in the negative.

The district court rejected this construct. It found that Rodrigues's testimony supported a finding that the enterprise existed from at least 1997 until at least 2001. It further found that the evidence indicating that the Wendover/Stonehurst feud had its origins in the Mendes killing was enough to support the conclusion that Stonehurst was active as far back as 1995. While it acknowledged that there was no evidence of Stonehurst's existence from 2002 through 2004, the court found such evidence unnecessary because substantially all the relevant activity of the enterprise took place during the 1996-2001 time frame. The court added that, in any event, the exact duration of the enterprise was not an essential element of the offense. In its view, the government demonstrated the required continuity, and no more was exigible.

The court concluded by analyzing what had happened as a type of variance. A variance occurs when "the proof at trial depicts a scenario that differs materially from the scenario limned in the indictment." United States v. Escobar-de Jesús, 187 F.3d 148, 172 (1st Cir. 1999). The existence of a variance does not automatically result in the vacation of a conviction. A variance only requires the setting aside of a conviction if it is prejudicial. See United States v. Villarman-Oviedo, 325 F.3d 1, 21 (1st Cir. 2003). Discerning no prejudice from this particular variance, the district court denied the appellants' motions for either judgment of acquittal or a new trial.

The appellants attack the district court's ruling on several levels. Their first attack is fact-oriented: they concede that Rodrigues testified that he was a Stonehurst member from 1997 through 2001, but they assert that he only described activities occurring during 1998 and 2000. This is too isthmian a view of Rodrigues's testimony.

Rodrigues testified that the shootings between Wendover and Stonehurst "started . . . back in '95" and were "still ongoing." At the very least, this testimony supports the district court's conclusion that Stonehurst, as an entity dedicated to wreaking havoc on Wendover, existed through the end of Rodrigues's tenure (2001). The question, then, is whether the jury verdict can

be supported by testimony concerning that somewhat truncated time span.

The appellants, citing the Second Circuit's decision in United States v. Morales, 185 F.3d 74 (2d Cir. 1999), insist that it cannot. In Morales, the indictment alleged that the defendants had belonged to a continuous enterprise that existed for a nine-year period. Id. at 78. The proof, however, showed conclusively that the enterprise had been dormant for seven years in the middle of that period because its entire membership had been incarcerated. Id. at 79. The court held that the evidence was insufficient to show that the "enterprise existed for the duration alleged in the indictment." Id. at 81. The court refused to "consider whether the evidence was sufficient to support a finding of a shorter racketeering enterprise" on the ground that the "indictment charged a single nine-year enterprise, and the jury was instructed that it could only convict on the racketeering and racketeering-dependent counts if it found that the specific enterprise set out in the indictment existed." Id.

The appellants asseverate that this case and Morales are peas in a pod. They are not. The concerns underlying the decision in Morales are very different from what is involved here. In Morales, the government attempted to play fast and loose with RICO's continuity requirement — and it did so in a way that threatened to impair the defendants' rights (by constructing the

-17-

indictment in a manner that allowed the introduction, in a single trial, of evidence concerning two distinct criminal organizations). Under those circumstances, we readily understand why the Morales court was disinclined to allow the government to argue, after putting before the jury significantly inculpatory evidence from both periods, that either organization, by itself, could have satisfied the continuity requirement. That would, in effect, have given the government a second bite at the cherry.

The scenario here is vastly different. While the indictment may have marginally overclaimed — the record contains very little concerning the 2002-2004 period — there was no question of shifting enterprises and no attempt to stack the deck by introducing damning bits of evidence from a different orangization's conduct in a different era. Moreover, the government had adduced ample proof that a single enterprise was continuously active in the slightly narrowed period. Indeed, the trial seems to have proceeded on the premise that this narrowed period was the relevant time frame.[2]

To cinch matters, the appellants had every reason to believe that the period from 1996 through 2001 would be the crucial period for purposes of the RICO and other racketeering-dependent counts. Of the twenty-one racketeering acts listed in the

_____

[2]The trial transcript reveals quite clearly that the able district judge reined in witnesses who attempted to discuss matters outside that time frame.

indictment, twenty were alleged to have occurred in that time frame (the lone exception — the general charge that Stonehurst members had conspired to kill Wendover members — was described as having spanned the period from 1996 until 2004).  This not only erases any doubt that the indictment gave the appellants fair notice of the focus of the charges against them, but also confirms that the government did not benefit in any way from describing a slightly longer period in the indictment.

Under these circumstances, we do not think that the government can be said to have assumed the burden of proving the operation of Stonehurst from 1996 to 2004 merely by mentioning those dates in the indictment.  The period represented a mere factual allegation; it did not constitute an element of the offense.  That is a significant difference.  See United States v. Mueffelman, 470 F.3d 33, 38 (1st Cir. 2006) (describing the difference between a deviation from the charging terms and a deviation from facts alleged in an indictment).

In the last analysis, we see no merit in the appellants' "law of the case" argument.  The district court charged the jury in relevant part that the government had the burden of proving that the enterprise operated continuously "during substantially the entire period alleged in the indictment."  "Substantially" is a relative term, which invites a weighing of the salience of covered items against the salience of non-covered items.  Cf. United States

v. Castaneda, 162 F.3d 832 838 (5th Cir. 1998) (holding that a party has "substantially performed" when his "relatively insignificant omissions" are "dwarfed by [his] performance"). Bearing in mind that virtually all the overt acts that comprised the substance of the indictment were completed prior to 2002, we think that a rational jury could conclude that the period form 1996 through 2001 was "substantially" the entire period covered by the indictment.

## B.

A second element of a RICO violation is an effect on interstate or foreign commerce. Foreign commerce is not implicated here, and the district court instructed the jury that the interstate commerce requirement would be satisfied by a showing that Stonehurst's actions had at least a de minimis effect on interstate commerce. This instruction would have been unarguably correct in most RICO cases. See, e.g., Marino, 277 F.3d at 35; United States v. Riddle, 249 F.3d 529, 537 (6th Cir. 2001). Seizing on the fact that Stonehurst did not engage in any economic activity, see supra note 1, the appellants argue that this case is different. In their view, the instruction misstates RICO's statutory requirement with respect to enterprises that have not engaged in economic activity. They argue, in the alternative, that if the instruction is correct as a matter of statutory interpretation, the statute is unconstitutional as applied to their

-20-

enterprise. As a fallback, they assert that, even if the instruction can withstand these attacks, the evidence was insufficient to satisfy even the modest de minimis standard. We consider each facet of this asseverational array.

### 1.

We start with the appellants' contention that, on the facts of this case, the RICO statute requires more than a de minimis effect on interstate commerce. This is an uphill battle; this court has held, squarely and explicitly, that a de minimis effect on interstate commerce is all that is required to satisfy RICO's commerce element. See Marino, 277 F.3d at 35.

The appellants attempt to skirt this obstacle by suggesting that a more rigorous standard pertains in cases, like this one, in which a RICO enterprise has not engaged in economic activity. To distinguish Marino, they point out that the enterprise in question there was found to be involved in drug trafficking — plainly a form of economic activity.

This argument is peculiar. Although nothing in the text of RICO suggests it, the appellants urge us to read a single phrase in the statute as requiring different things in different situations: in a case involving an enterprise engaged in economic activity, the government would have to show only a de minimis effect on interstate commerce, whereas in a case involving an enterprise engaged in violence but not in economic activity, the

-21-

government would have to show a more substantial effect on interstate commerce. We reject this iridescent reading of the statute.

By its terms, the RICO statute applies to any "enterprise engaged in, or the activities of which affect, interstate or foreign commerce." 18 U.S.C. § 1962(c). There is nothing in either the statutory language or the legislative history that supports the appellants' contention that these words mean different things as applied to different types of enterprises. Courts are not charged with the task of writing statutes or improving upon them but, rather, with the more mundane task of figuring out, consistent with the statutory text, what the authoring Congress intended. This division of functions, as well as basic principles of statutory construction, counsels persuasively against a court trying to tease from the simple word "affect" sophisticated gradations of meaning that will vary from situation to situation. See Ratzlaf v. United States, 510 U.S. 135, 143 (1994) ("Ascribing various meanings to a single iteration of [a word] . . . would open Pandora's jar.").[3]

---

[3]Among their gallimaufry of arguments, the appellants suggest that our opinion in United States v. McCormack, 371 F.3d 22, 28 (1st Cir. 2004), vacated on other grounds, 543 U.S. 1098 (2005), required a showing of a heightened effect on commerce to sustain a Hobbs Act conviction when the victim of the robbery was not a business. This suggestion overlooks the fact that we applied a de minimis standard in McCormack itself. See id. (stating that the evidence showed "a 'realistic probability' that the [underlying crime] would have a de minimis effect on interstate commerce").

The appellants try to clear this hurdle by using the Sixth Circuit's decision in Waucaush as a springboard. That court adopted the position that the appellants espouse, holding that the RICO statute reaches an enterprise engaged in noneconomic violent crime only if the enterprise's activities have a substantial effect on interstate commerce. 380 F.3d at 255-56. The appellants invite us to follow Waucaush. We respectfully decline the invitation.

In reaching this result, the Waucaush court did not employ any of the usual tools of statutory construction. The absence of anything in the reasoning of that court that explains how it is possible, consistent with sound canons of statutory construction, to read the word "affect" as possessing two different meanings depending upon additional facts not mentioned in the statute itself, makes the decision suspect.

Instead of relying upon principles of statutory construction, the Waucaush court based its holding on a professed desire to "avoid interpreting a statute to prohibit conduct which Congress may not constitutionally regulate." Id. at 255.[4] Echoing this refrain, the appellants argue, in effect, that application of

The language in McCormack to which the appellants advert relates to the degree of scrutiny, not the quantum of proof.

[4]We think it is useful to note at this juncture that Waucaush was decided without the benefit of the Supreme Court's decision in Gonzales v. Raich, 545 U.S. 1 (2005), a precedent that we find instructive on the constitutional issue. See Part II(B)(2), infra.

the RICO statute to their activities raises grave constitutional concerns and, for that reason, we should abstain from reading the statute as encompassing noneconomic activities that have only a de minimis effect on interstate commerce. To hammer home this point, they remind us that the Supreme Court recently deployed the constitutional avoidance doctrine in construing a federal arson statute to avoid commerce power concerns. See Jones v. United States, 529 U.S. 848, 857-58 (2000) (construing 18 U.S.C. § 844(i)).

This argument reflects a misunderstanding of the operation of the doctrine of constitutional avoidance. Since Jones and Waucaush were decided, the Supreme Court has made it clear that the doctrine does not serve to give alternative meanings to statutory phrases in cases in which a statute's application might be constitutionally dubious. Courts simply are not "free to 'interpret' statutes as becoming inoperative when they 'approach constitutional limits.'" Clark v. Martinez, 543 U.S. 371, 384 (2005). Rather, the doctrine of constitutional avoidance operates at "the lowest common denominator," providing a single definition for a phrase that is then applied even in cases in which a broader reading would not be constitutionally dubious. Id. at 380.

That ends this aspect of the matter: because, in Marino, we already have defined the word "affecting" as used in the RICO statute, we are not now free to alter the meaning of that term for

a particular fact pattern. Nor is the option of limiting the definition of the term "enterprise" to profit-seeking entities open to us. See Nat'l Org. for Women, Inc. v. Scheidler, 510 U.S. 249, 262 (1994). Given the case law, there is simply no room remaining for efforts at constitutional avoidance.

Jones is not to the contrary. In that case, the Court focused upon a particular phrase in the federal arson statute: "used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce." 18 U.S.C. § 844 (i). The Court determined that the word "used" denotes "active employment." Jones, 529 at 855. Utilizing that definition, it concluded that the statute did not cover the burning of owner-occupied residential real estate. See id. at 859. The Court did not give the statutory language a case-specific meaning but, rather, provided a single definition applicable in all cases.[5] The appellants ask us to do something very different here: to give two divergent meanings to a single word in a single statute and to pick and choose between those definitions depending on the facts of future cases. We are not willing to undertake so exotic a mission.

---

[5]The Jones Court specifically distinguished the phrasing of the arson statute from statutes reaching all activity "affecting commerce," describing the latter phrase as "words that, when unqualified, signal Congress' intent to invoke its full authority under the Commerce Clause." Jones, 529 U.S. at 854. Given that the RICO statute uses precisely this phraseology, we do not think that Jones lends any support to the notion that the words "affect . . . commerce" may be read vagariously in the name of constitutional avoidance.

In a final sortie, the appellants argue that the district court erred in refusing to limit the definition of conduct that "affect[s]" commerce to conduct detrimental to commerce. This argument is gleaned from the Supreme Court's holding in Scheidler, 510 U.S. at 262, that RICO could be applied to an enterprise that engaged in racketeering activity notwithstanding the absence of an economic motive. The Scheidler Court reasoned that "[a]n enterprise can surely have a detrimental influence on interstate or foreign commerce without having its own profit-seeking motives." Id. at 258. The appellants read this language as implying that only detrimental effects on commerce are within the contemplation of the RICO statute when applied to enterprises that are not economically motivated.

Although one district court has read Scheidler in this restrictive manner, see United States v. Garcia, 143 F. Supp. 2d 791, 815 (E.D. Mich. 2000), we are not persuaded. The fact that the Scheidler Court discussed only detrimental effects is something of a makeweight; that analysis corresponded to the facts of the particular case. Nothing in the opinion suggests that the Court's casual reference to "detrimental influence" was intended to limit the "affecting commerce" language of the RICO statute.

The right of the federal government to use the power conferred by the Commerce Clause for regulatory objectives, apart from the direct promotion and protection of interstate commerce,

has been ingrained in our jurisprudence for over a century. See, e.g., Champion v. Ames (The Lottery Case), 188 U.S. 321, 362 (1903). Because the word "affect" has an established meaning in statutes defining the scope of federal jurisdiction as bespeaking an intention to legislate to the outermost perimeter of Congress's Commerce Clause power, see Jones, 529 U.S. at 854, statutes regulating undescribed activities that "affect" interstate commerce perforce must reach all activities that come within Congress's power. This paradigm includes ensuring that the tools of commerce are not employed in a manner injurious to the public. Hodel v. Va. Surface Min. & Reclam. Ass'n, Inc., 452 U.S. 264, 281-82 (1981).

Against this backdrop, we cannot say that the word "affect," as used in the RICO statute, is restricted to conduct that produces detrimental effects on commerce. This is especially true where, as here, we are asked to apply the definition in a subset of RICO cases (i.e., cases involving enterprises engaged exclusively in noneconomic activities), thereby creating an anomalous situation in which a single word in a single statute simultaneously would have varying meanings, depending on context. We conclude, therefore, that the district court did not err in refusing to deviate from the accepted meaning of the phrase "affect[ing] . . . commerce."

## 2.

We move now to the appellants' most touted claim of error: that the RICO statute, as applied to an enterprise engaged exclusively in noneconomic criminal activity, is unconstitutional. In framing this claim, the appellants place great weight on a trilogy of recent Supreme Court cases establishing limits on the federal government's power to legislate under the Commerce Clause. See United States v. Morrison, 529 U.S. 598, 627 (2000); Jones, 529 U.S. at 859; United States v. Lopez, 514 U.S. 549, 567 (1995). These cases, in combination, galvanized the Sixth Circuit in Waucaush, so the opinions deserve careful attention.

In the first of these cases, the Court struck down a federal statute that, without reference to any effect on commerce, criminalized the possession of a firearm within 1,000 feet of a school. Lopez, 514 U.S. at 551. In concluding that Congress lacked power under the Commerce Clause to enact the school-zone legislation, the Court explained that the commerce power may only be used to justify three different kinds of laws: those regulating the channels of interstate commerce, those regulating the instrumentalities of and things moving in interstate commerce, and those regulating activities substantially affecting interstate commerce. See id. at 558-59. Because it is this third category of regulatory authority that is in issue here, we elaborate briefly on it.

With respect to this third category, the Court noted that individual instances of regulated conduct need not be substantial as long as the aggregate conduct exerts a substantial effect on interstate or foreign commerce. See id. The Court warned, however, that aggregation is appropriate only as to "economic" activities. Id. at 560. The Court has since defined "economic," in the relevant sense, as relating to the "production, distribution, or consumption of commodities." Gonzales v. Raich, 545 U.S. 1, 25 (2005) (quoting Webster's Third New International Dictionary 720 (1966)).

The second case in the trilogy built upon this foundation. There, the Court struck down the Violence Against Women Act, which had sought to provide federal civil remedies to victims of gender-motivated violence. Morrison, 529 U.S. at 602. Notwithstanding a congressional finding that gender-motivated violence exerts a substantial drain on the economy, the Morrison Court "reject[ed] the argument that Congress may regulate noneconomic, violent criminal conduct based solely on that conduct's aggregate effect on interstate commerce." Id. at 617. The Court explained that "the suppression of violent crime and the vindication of its victims" was quintessentially within the police power of the several states (and, by implication, not within the federal commerce power per se). Id. at 618.

The remaining case in the trilogy is Jones. As previously discussed, see supra Part II(B)(1), the Jones Court held that the incineration of private residences was beyond the reach of a federal arson statute. 529 U.S. at 859. That narrow interpretation enabled the Court to avoid "grave and doubtful constitutional questions." Id. at 857.

Drawing on these precedents, the appellants maintain that their criminal activities are an almost exact match for the violent criminal conduct that the Morrison Court refused to aggregate (and, thus, placed beyond the reach of Congress's Commerce Clause power). They add, moreover, that federal regulation of noneconomic street crime under a theory of aggregation would obliterate any semblance of a constitutional limit on federal power. Cf. Lopez, 514 U.S. at 567 (commenting that the Constitution's enumeration of federal powers "presupposes something not enumerated").

We share the appellants' concern that the government's theory here, aggressively pursued, might threaten to trespass on an area of traditional state concern. But though the argument has some bite, it ultimately fails to persuade.

The principal problem with the argument is that it runs at cross purposes with the Supreme Court's decision in Raich (the Court's most recent explication of the scope of federal power under the Commerce Clause). The Raich decision is critically important for present purposes because it is more directly on point than any

case in the earlier trilogy. Lopez and Morrison involved facial challenges to federal statutes: in each case, the parties asserted that a particular statute or provision fell outside Congress's commerce power in its entirety. Jones was an exercise in statutory construction.

The case at hand, however, entails an as-applied challenge to a generally valid federal statute. Raich is of the same genre; it involved a request "to excise individual applications of a concededly valid statutory scheme." Raich, 545 U.S. at 23. The Raich Court deemed this distinction "pivotal" because when "the class of activities is regulated and the class is within the reach of federal power, the courts have no power to excise, as trivial, individual instances of the class." Id. (internal quotation marks omitted). Raich supplies a gloss on the earlier trilogy and, in the bargain, offers meaningful guidance as to how courts should approach as-applied challenges under the Commerce Clause.

In Raich, the Supreme Court upheld two provisions of the Controlled Substances Act, 21 U.S.C. §§ 841(a)(1), 844(a), as applied to the intrastate and noncommercial cultivation of medical marijuana. Raich, 545 U.S. at 9. There, the plaintiffs sought to define their activity at a level of specificity designed to highlight its noneconomic nature. The Court rejected this effort at miniaturization, preferring instead to defer to Congress's declaration of the level of specificity with which an activity

-31-

should be classified for the purpose of determining whether that activity, in the aggregate, affects interstate commerce. See id. at 30. The Court refused to credit either the Ninth Circuit's effort to isolate a separate and distinct class of activity, id. at 26, or the state legislature's effort to "surgically excise[]" medical marijuana from the generality of the drug laws, id. at 30. The Court chose instead to defer to Congress's decision not to distinguish between medical marijuana cultivated for noncommercial purposes and the mine-run of marijuana cultivation. Id. at 22. Because there was no basis on which "to excise individual components of that larger scheme," the Court concluded that marijuana cultivation writ large was the appropriate activity to be considered in the Commerce Clause calculus. Id. at 28. Accordingly, the plaintiffs' as-applied challenge failed. See id. at 32-33.

Of course, Raich is arguably distinguishable from the case at hand on the ground that marijuana is a fungible commodity, capable of seeping into the interstate market regardless of the purpose for which it is grown. But we refuse to accord decretory significance to a distinction that the Raich majority did not deem decisive. The majority emphasized that it is the "class of activity" that is relevant. Id. at 17. Such classes need not be delineated with "scientific exactitude." Id. This formulation is markedly different from the one offered by Justice Scalia, who argued unsuccessfully that Congress may regulate noneconomic

-32-

intrastate activities "only where the failure to do so could . . . undercut its regulation of interstate commerce." Id. at 39 (Scalia, J., concurring in the judgment) (alteration in original). While Justice Scalia attributes this view to the majority, see id., we read the majority opinion — especially its disclaimer of "scientific exactitude" — as declining to require so rigid a taxonomy. See id. at 26-27 (opinion of the Court) (requiring only that Congress act "rationally" when making a "policy judgment" that purely intrastate activities are an essential part of the larger regulatory scheme). We think that Justice Scalia's election not to join the Court's opinion bears witness to the majority's unwillingness to take a more extreme view.

Refined to bare essence, Raich teaches that when Congress is addressing a problem that is legitimately within its purview, an inquiring court should be slow to interfere. Assuming the existence of a rational basis for the solution that Congress has devised, the court should respect the level of generality at which Congress chose to act. See id. at 22. It is simply too "impractical" for a court to insist that Congress make "detailed findings proving that each activity regulated within a comprehensive statute is essential to the statutory scheme." Id. at 21 n.32.

Given the lessons of Raich, it is evident that the appellants' constitutional argument — like that of the Waucaush court — misapprehends the relevant unit of analysis. The linchpin

of their argument is the fact that Stonehurst's activities were undertaken without an economic motive. In the long run, however, that isolated fact is of little significance. The correct mode of analysis requires a more global view. "Congress's power to criminalize . . . conduct pursuant to the Commerce Clause turns on the economic nature of the class of conduct defined in the statute rather than the economic facts . . . of a single case." United States v. Morales-de Jesús, 372 F.3d 6, 18 (1st Cir. 2004) (emphasis supplied).

Thus, the class of activity is the relevant unit of analysis and, within wide limits, it is Congress — not the courts — that decides how to define a class of activity. All that is necessary to deflect a Commerce Clause challenge to a general regulatory statute is a showing that the statute itself deals rationally with a class of activity that has a substantial relationship to interstate or foreign commerce. See Maryland v. Wirtz, 392 U.S. 183, 196 n.27 (1968). The intrastate or noneconomic character of individual instances within that class is of no consequence. See id. This core principle is fully applicable to criminal statutes. See Perez v. United States, 402 U.S. 146, 154 (1971) (cited with approval in Lopez, 514 U.S. at 558).

The appellants' argument cannot withstand scrutiny under this framework. The RICO statute by its terms is limited to racketeering enterprises that "affect . . . commerce," and the VICAR

statute is similarly circumscribed. This jurisdictional element ties the statutes directly to commerce in a more explicit way than the statutes at issue in Lopez, 514 U.S. at 561, or Morrison, 529 U.S. at 611, or, since neither section 841(a)(1) nor 844(a) has a nexus requirement, even Raich. See United States v. Crenshaw, 359 F.3d 977, 986-87 (8th Cir. 2004) (drawing this distinction with respect to VICAR).

What is more, the general class of activity is a wholly legitimate target of Commerce Clause legislation. Racketeering activity, as a general matter, is based largely on greed. Cf. 1 Timothy 6:10 ("[T]he love of money is the root of all evil."). Particular manifestations include loansharking, extortion, and a host of other financially driven crimes. See 18 U.S.C. § 1961(1) (defining "racketeering activity"). Therefore, that class of activity is sufficiently economic in nature that it may be aggregated for Commerce Clause purposes. See Perez, 402 U.S. at 154 (upholding aggregation of extortionate credit transactions).

Given the obvious ties between organized violence and racketeering activity — the former is a frequent concomitant of the latter — we defer to Congress's rational judgment, as part of its effort to crack down on racketeering enterprises, to enact a statute that targeted organized violence. See Raich, 545 U.S. at 22 (describing as a "modest" task judicial scrutiny of whether Congress had a rational basis for encompassing particular activity within the

sweep of a statute); Crenshaw, 359 F.3d at, 986 (upholding VICAR against a Commerce Clause challenge and discussing the legitimacy of targeting violence in aid of racketeering as a means of controlling racketeering enterprises). Thus, applying the RICO statute to the appellants' activities does not offend the Commerce Clause.[6]

**3.**

We next examine the appellants' contention that the government failed to adduce evidence sufficient to show even a de minimis connection between Stonehurst's activities and interstate commerce. Because Stonehurst has not been engaged in racketeering activity of an economic nature, we employ heightened scrutiny throughout this examination. See United States v. McCormack, 371 F.3d 22, 28 (1st Cir. 2004) (discussed supra note 3), vacated on other grounds, 543 U.S. 1098 (2005).

The evidence most loudly bruited by the government relates to the fact that one of the shootings perpetrated by Stonehurst occurred in a round-the-clock tire shop engaged in interstate commerce. The shooting took place after midnight and the ensuing investigation caused the shop to close for several hours.

---

[6]To be sure, this degree of deference to congressional classifications may create perverse incentives. Yet, one of the dissenters in Raich made this argument, see Raich, 545 U.S. at 46 (O'Connor, J., dissenting), and the majority bluntly rejected it. See id. at 25 n.34 (opinion of the Court). We, like the Justices, are confident that political checks and balances will prevent any such legislative overreaching.

The government first posits that the temporary closing of a business engaged in interstate commerce had an effect on commerce sufficient to satisfy the de minimis standard. In support of this proposition, it cites cases such as United States v. Vega Molina, 407 F.3d 511, 527 (1st Cir. 2005), United States v. Juvenile Male, 118 F.3d 1344, 1349 (9th Cir. 1997), and United States v. Davis, 30 F.3d 613, 615 (5th Cir. 1994). But the suggested comparison is not apt: in those cases, the closed business was itself the target of a planned robbery. In contrast, the Stonehurst members had no designs on the tire shop per se; they merely held a grudge against one of the shop's customers and happened to find it convenient to ambush him there.

To add another distinguishing dimension, the closings in the cited cases were for longer intervals and, thus, caused considerably more disruption of the business. See, e.g., Vega Molina, 407 F.3d at 527 (describing a full-day closure); Juvenile Male, 118 F.3d at 1349 (describing a closure lasting "several days"); Davis, 30 F.3d at 615 (describing the temporary shutdown of four gas stations). In contrast, the tire shop here was closed, in the dead of night, for a matter of hours. Moreover, the proprietor testified that he "suspected" that some business had been lost because there was less "paperwork" than usual but he could not definitively identify any such shortfall.

The government also posits that Stonehurst members' regular use of cellular telephones as a means of coordinating their activities comprised the requisite nexus to commerce.  But again, the cases that it cites are of scant assistance.  In each of them, the court mentioned telephone use only after it had enumerated a series of more binding links to commerce.  See United States v. Delgado, 401 F.3d 290, 297 (5th Cir. 2005) (chronicling involvement in international drug trafficking, use of the mails, and use of Western Union); United States v. Pipkins, 378 F.3d 1281, 1294-95 (11th Cir. 2004) (describing trafficking of women and recruitment of prostitutes across state lines), vacated on other grounds, 544 U.S. 902 (2005).

To be sure, one court has ruled that "telephone use by the [enterprise] sufficiently affects interstate commerce to satisfy the RICO nexus requirement," United States v. Muskovsky, 863 F.2d 1319, 1325 (7th Cir. 1988), but the enterprise at issue there was engaged in economic activity.  We are more dubious here both because the enterprise was devoted to noneconomic activities and because the government's evidence concerning cell-phone use was skimpy.

The government's best evidence on this point consisted of testimony to the effect that gang members communicated with each other by cell phone in order to keep abreast of important information, such as when things had become "hot" following a shooting.  In addition, at least two shootings attributable to

-38-

Stonehurst (those directed at Wendover members Luis Carvalho and Antonio Cabral) were precipitated by cell-phone calls to or between Stonehurst members identifying where the intended victim might be found. There was, however, some countervailing evidence. For example, the government's star witness, Augusto Lopes, stated that Stonehurst did "[n]ot necessarily" use cell phones to discuss acts of violence because "they can be bugged."

In the end, we need not resolve whether either the tire shop or cell-phone evidence, alone or in tandem, suffices to make out the requisite de minimis connection between the enterprise and interstate commerce. As we explain below, there is surer footing in this case for a finding that the government satisfied the "affecting commerce" element of the offense.

The record reflects that Stonehurst maintained an arsenal — no fewer than nine different firearms used by Stonehurst members in carrying out Stonehurst business. This and other evidence led the district court to conclude that Stonehurst was a "massive purchaser of guns." With one exception (a Smith & Wesson revolver made in Massachusetts), all the firearms acquired by Stonehurst had been manufactured outside of Massachusetts and, thus, had moved in interstate commerce.

The appellants try to blunt the force of this evidence by citation to United States v. Kallestad, 236 F.3d 225 (5th Cir. 2000), in which the Fifth Circuit stated "[i]t is one thing for

Congress to prohibit possession of a weapon that has itself moved in interstate commerce, but it is quite another thing for Congress to prohibit homicides using such weapons." Id. at 229. Were the wielding of out-of-state guns, simpliciter, the only hook on which the "affecting commerce" element could be hung, the Fifth Circuit's caveat might give us pause. Here, however, the "gun" evidence is strengthened measurably by testimony that, during the currency of the RICO conspiracy, Lattimore traveled from Massachusetts to New Hampshire, purchased a firearm, and brought it back to Massachusetts. That weapon became part of Stonehurst's arsenal and was later fired by a Stonehurst member at a car in which Wendover members were thought to be riding.

The fact that a Stonehurst member actually crossed state lines to purchase a weapon for use in carrying out the enterprise's activities is entitled to great weight in the decisional calculus; crossing state lines for purpose of engaging in a commercial transaction is a paradigmatic example of an activity that falls within the compass of the commerce power.[7] Cf. United States v. Clark, 435 F.3d 1110, 1114 (9th Cir. 2006) (noting that "requiring travel in foreign commerce, coupled with engagement in a commercial

-----

[7]Travel to another state in order to effectuate a gun purchase distinguishes this case from Garcia, a district court case relied on by the appellants. In finding insufficient evidence of economic activity to sustain a RICO conviction of a street gang, the Garcia court took pains to note the absence of any allegation "that the members of the [gang] traveled out of state to purchase weapons." 143 F. Supp. 2d at 807.

transaction while abroad, implicates foreign commerce to a constitutionally adequate degree"). This purchase, coupled with the evidence concerning the amassed arsenal of firearms manufactured out of state, suffices to satisfy RICO's interstate commerce nexus. It follows that the tire shop evidence and the evidence of cell-phone use are, in the circumstances of this case, merely frosting on the cake.

## C.

The final element in the RICO equation requires the government to show that a defendant participated in the conduct of the enterprise "through a pattern of racketeering activity." 18 U.S.C. § 1962(c). A pattern requires a minimum of two racketeering acts. See id. § 1961(5). The word "through" implies a nexus between these racketeering acts and the enterprise. That nexus exists when a defendant is able to commit the predicate racketeering acts either by means or as a result of his involvement with the enterprise. See Marino, 277 F.3d at 27.

In this instance, the jury found that Nascimento had committed two racketeering acts: (i) shooting DoCanto and (ii) conspiring to kill Wendover members. He argues before us that the evidence did not support a finding that a relationship existed between the DoCanto shooting and his membership in Stonehurst. If this argument prevails, it would thwart the government's effort to

-41-

prove a pattern of racketeering activity, and Nascimento's conviction would topple.

Nascimento marshals a similar argument concerning his VICAR conviction for assault in aid of racketeering. VICAR forbids, inter alia, committing assault with a dangerous weapon "for the purpose of gaining entrance to or maintaining or increasing position in" a racketeering enterprise. Id. § 1959(a)(3). Thus, if the evidence was inadequate to support a finding that he shot DoCanto to maintain his position in Stonehurst, then the VICAR conviction cannot stand.

In approaching these arguments, one fact sticks out like a sore thumb. Despite the perfervid rhetoric in which the arguments are couched, Nascimento does not challenge the sufficiency of the government's proof that he actually shot DoCanto. Our task, therefore, is to undertake de novo review in order to ascertain whether, taking all reasonable inferences in the government's favor, rational jurors could find beyond a reasonable doubt that the necessary relationship existed between Nascimento's shooting of DoCanto and his membership in Stonehurst. See Connolly, 341 F.3d at 22.

The record reflects that on the night of November 29, 1998, DoCanto was standing near her car. Her boyfriend, Anildo Rocha, was inside the vehicle. Nascimento opened fire, hitting DoCanto in the left leg. Although there is no evidence that either

-42-

DoCanto or Rocha were Wendover members, Augusto Lopes testified that Nascimento stated that he had fired the shots with the intention of hitting the man in the car, whom he mistakenly believed to be DoCanto's brother, Joaquim "Big Rocky" Martins. In light of this testimony, Nascimento's claim of error boils down to a plaint that the evidence was too thin to warrant a finding that Nascimento understood his intended target — Big Rocky — to be affiliated with Wendover.

This plaint rests heavily on Lopes's further testimony that "Big Rocky . . . wasn't associated with nobody." Lopes added, however, that Big Rocky "was actually involved in the problems." The jury, of course, was entitled to discount the former statement and to credit the latter. See, e.g., United States v. Alicea, 205 F.3d 480, 483 (1st Cir. 2000) (acknowledging jury's "prerogative to credit some parts of a witness's testimony and disregard other potentially contradictory portions").

Endeavoring to parry this thrust, Nascimento argues that the allusion to "the problems" might be a reference to the fact that Big Rocky was a witness to the Mendes murder committed by Nardo Lopes, not a reference to any involvement with Wendover. That interpretation is propped up by Rodrigues's testimony that he understood Big Rocky to be one of the witnesses against Nardo Lopes. But the government counters, with considerable force, that at a different place in his testimony Augusto Lopes unequivocally named

-43-

Big Rocky as a Wendover collaborator.  The government also notes that the jury heard testimony from an admitted Wendover member, Adiello DaRosa, that Big Rocky was associated with Wendover.

Sifting through conflicting testimony and determining where the truth lies is the sort of work that falls squarely within the jury's province.  So it is here: the question is one of fact, and the answer depends on what evidence the jurors deign to credit.  When a jury, which has seen and heard the witnesses, picks and chooses among conflicting accounts, an appellate court should almost always honor that choice.  See United States v. Gobbi, 471 F.3d 302, 311 (1st Cir. 2006) (explaining that it is "ultimately the province of the jury to assess the significance of any contradictions in the evidence").

That effectively ends this aspect of the matter.  Once the jury had decided which account of Big Rocky's status should be credited, the legal implications of that decision were clear.  Consequently, we reject Nascimento's claim of error.[8]

---

[8]Nascimento offers a laundry list of cases in which courts have overturned convictions under RICO and VICAR based on the prosecution's failure to establish the requisite nexus between the predicate act and the enterprise.  See, e.g., United States v. Bruno, 383 F.3d 65, 85-86 (2d Cir. 2004); United States v. Ferguson, 246 F.3d 129, 136 (2d Cir. 2001); United States v. Polanco, 145 F.3d 536, 539-40 (2d Cir. 1998); United States v. Thai, 29 F.3d 785, 818 (2d Cir. 1994).  Without exception, these cases — all of which either explore the degree of attenuation permissible between a racketeering act and an enterprise or highlight the utter absence of any evidence supporting a relationship between the two — are inapposite.

Nascimento argues in the alternative that, given the contradictions in the testimony, the jury could not rationally have found him guilty beyond a reasonable doubt. He cites United States v. Morillo, 158 F.3d 18, 22 (1st Cir. 1998), for the familiar proposition that when the evidence, viewed in the light most favorable to the prosecution, supports both a theory of guilt and an equally likely theory of innocence, reasonable jurors must perforce entertain a reasonable doubt. In this case, however, the jury was under no compulsion to deem the contrasting theories of guilt and innocence equally likely. The jury plausibly could have credited the clear and unambiguous statement of DaRosa, himself a Wendover stalwart and presumably a reliable source of information about the gang's composition, that Big Rocky was a Wendover member and was for that reason "part of the problems."

Nascimento advances a further argument to the effect that VICAR requires an even tighter relationship between a predicate racketeering act and an enterprise because the act must be "for the purpose of gaining entrance to or maintaining or increasing position in an enterprise." 18 U.S.C. § 1959(a). This argument is foreclosed by precedent: the VICAR provision is satisfied as long as the criminal act can be said to have been expected of the defendant by reason of his membership in the enterprise. United States v. Tse, 135 F.3d 200, 206 (1st Cir. 1998). The totality of

the evidence in regard to Nascimento's shooting of DoCanto passes that test.

To say more on this point would be superogatory. We conclude, on whole-record review, that the evidence was sufficient to sustain both an inference that Nascimento fired at DoCanto as part of an effort to eliminate a member of the rival Wendover gang and an inference that this conduct was expected of him by reason of his membership in Stonehurst. Thus, there is an adequate relationship, for both RICO and VICAR purposes, between the challenged racketeering act and the enterprise.

## III.

The jury convicted both Talbert and Nascimento on a trio of charges: a substantive RICO offense, RICO conspiracy, and VICAR conspiracy to commit murder. In each case, one of the racketeering acts undergirding the substantive RICO charge was conspiracy to commit murder. These two appellants now say that the interplay between the substantive RICO charge and the conspiracy charges offended the Double Jeopardy Clause. For the reasons that follow, we reject their importunings.

One branch of the Double Jeopardy Clause forbids the government from punishing a person twice for the same offense. See U.S. Const., amend. V. Despite this proscription, the same conduct sometimes can be punished under more than one statute. See, e.g., United States v. Morris, 99 F.3d 476, 477-78 (1st Cir. 1996). Such

multiple punishments are permissible if the underlying offenses are distinct from one another, that is, if each offense "requires proof of a fact that the other does not." Blockburger v. United States, 284 U.S. 299, 304 (1932).

Here, Talbert and Nascimento argue that because conspiracy to commit murder served as a predicate act for their substantive RICO convictions, the VICAR charge that they conspired to commit murder lacked any element distinct from the substantive RICO charge. Second, and relatedly, each of them argues that his conviction for conspiracy to violate RICO was a lesser included offense within his substantive RICO conviction and, thus, barred under the Blockburger test. See Brown v. Ohio, 432 U.S. 161, 168 (1977) (discussing the relationship between lesser included offenses and double jeopardy).

These arguments are not persuasive. In Marino, 277 F.3d at 39, we held "that a substantive RICO violation and a RICO conspiracy are not the same offense for double jeopardy purposes." In the same opinion, we rejected the notion that a VICAR violation is a lesser included offense of a substantive RICO violation. See id.

The appellants' attempts to distinguish Marino are unavailing. They focus on two facts: (i) that Marino involved a greater number of racketeering acts and (ii) that here, unlike in Marino, the purpose of the enterprise (killing Wendover members) was

identical to the object of the charged conspiracy. Neither of those distinctions makes a dispositive difference.

The Blockburger test "depends on the elements of the crimes and not the similarity of the underlying facts." United States v. LeMoure, 474 F.3d 37, 43 (1st Cir. 2007). Thus, in resolving a double jeopardy challenge such as that advanced here, a court should not bog itself down in the minutiae of the evidence underlying the charges but, rather, should confine itself to the statutory elements of the two offenses. Because a "RICO conspiracy and a RICO violation do not necessarily require the participation of the same people," Marino, 277 F.3d at 39 (emphasis in the original), it is beside the point whether, in a particular instance, the racketeering acts are few or many, or whether the RICO conspirators and the RICO participants are identical. By the same token, the fact that the purpose of the enterprise and the object of the conspiracy happen to coincide is of no moment. See United States v. Sessa, 125 F.3d 68, 72 (2d Cir. 1997).

The appellants' fallback position rests on Wharton's Rule, which carves out a modest exception to the general principle that there is no bar to conviction for both a criminal conspiracy and a substantive criminal offense committed within the course of the conspiracy. See United States v. Previte, 648 F.2d 73, 76-77 (1st Cir. 1981) (explicating the rule). Wharton's Rule is limited to instances — adultery is a prime example — in which, as a statutory

matter, the completed offense necessarily involves conspiracy between the participants. See United States v. Iannelli, 420 U.S. 770, 785 (1975). We rejected a Wharton's Rule challenge in an earlier RICO case, see Marino, 277 F.3d at 39, and because the rule operates at the statutory level, see Iannelli, 420 U.S. at 780, we likewise reject the appellants' fact-bound attempt to resurrect what amounts to the same argument.

That brings this chapter to a close. The short of it is that these appeals do not implicate the Double Jeopardy Clause.

## IV.

The last leg of our journey requires us to consider Nascimento's assertion that the district court erred in refusing to suppress evidence seized from his room during an arrest.

The facts are as follows. Nascimento was facing state criminal charges arising out of the DoCanto shooting. He failed to report as required and a state magistrate issued a default warrant. On December 7, 1999, the police — armed with the arrest warrant but no search warrant — arrived at Nascimento's home. Following a consensual entry, they informed Nascimento (who was clad only in his underwear) that he was to be arrested. Because Nascimento seemed compliant, the officers did not handcuff him.

Two officers escorted Nascimento through the house to his bedroom so that he could get dressed. Once there, the officers did a quick sweep of the bed for weapons and sat Nascimento on it. One

of the officers proceeded to the clothes closet located eight to ten feet from the bed.  The officer performed a brief sweep of the closet, noticed an unlocked cabinet on the top shelf, reached in, and discovered a gun frame.  At that point, Nascimento was handcuffed.

Following his indictment in this case, Nascimento moved to suppress the gun frame as the fruit of an illegal search.  See U.S. Const., amend. IV.  The district court denied the motion. Nascimento appeals from this ruling.

It would be difficult to regard the introduction of the gun frame as harmless: it was matched by a government ballistics expert to shell casings found at one of the Stonehurst shootings. The fact that Nascimento had possession of the gun frame also served to corroborate Augusto Lopes, who testified that Nascimento had disassembled a gun following a shooting, handed the barrel to Lopes for disposal, and kept the frame. Given the force of this evidence, we think it best to address Nascimento's claim on its merits.

At the outset, it seems useful to distinguish between searches incident to arrest and protective sweeps.  Officers effecting an arrest are entitled to make a search incident to that arrest. Chimel v. California, 395 U.S. 752, 763 (1969). The scope of a search incident to an arrest is restricted to the area within the immediate control of the arrestee, that is, "the area from

within which he might gain possession of a weapon or destructible evidence."  Id.

Protective sweeps are conceptually distinct from searches incident to arrest.  They are not justified by the potential threat posed by the arrestee but, rather, by the potential threat posed by unseen third parties who may be lurking on the premises.  See Maryland v. Buie, 494 U.S. 325, 336 (1990).  Consequently, a protective sweep is limited to a "cursory visual inspection of those places where a person might be hiding."  Id. at 327; see United States v. Martins, 413 F.3d 139, 149-51 (1st Cir. 2005) (discussing protective sweep doctrine).

In this case, the district court cited both Chimel and Buie.  We confine our analysis more narrowly: because the cabinet searched was too small to accommodate a person, we concentrate on whether the search passes muster under Chimel.

There is some disarray in the case law as to standard of review that pertains to a determination of the permissible scope of a search incident to arrest.  Some courts have used a clearly erroneous standard.  See, e.g., United States v. Morales, 923 F.2d 621, 626-27 (8th Cir. 1991); United States v. Bennett, 908 F.2d 189, 193-94 (7th Cir. 1990).  Others have undertaken de novo review. See, e.g., United States v. Abdul-Saboor, 85 F.3d 664, 667 (D.C. Cir. 1996); United States v. Johnson, 18 F.3d 293, 294 (5th Cir. 1994) (opinion on rehearing).  In our judgment, a bifurcated

standard of review is appropriate.  See United States v. Espinoza,
___ F.3d ___, ___ (1st Cir. 2007) [No. 06-2065, slip op. at 5-7]
(discussing general approach to appellate review of district court
rulings on suppression motions); cf. United States v. Coker, 433
F.3d 39, 41 (1st Cir. 2005) (discussing the bifurcated standard of
review applicable to suppression rulings in the context of the Sixth
Amendment right to counsel).  Under that approach, we review the
district court's factual findings for clear error but review de novo
its ultimate constitutional conclusion.

        Before moving to the heart of Nascimento's argument, we
pause to brush aside a potential complication.  The police
originally encountered Nascimento in the front of the apartment.  At
that time, the cabinet was unquestionably beyond his immediate
control.  Under the circumstances, however, it was not inappropriate
for the police to escort Nascimento to his bedroom in order that he
might get dressed.

        When police encounter and arrest a partially clothed
individual in his home, the need to dress him may constitute an
exigency justifying the officers in entering another room in order
to obtain needed clothing.  See United States v. Gwinn, 219 F.3d
326, 333 (4th Cir. 2000).  Generalizations are hazardous because one
can imagine infinitely variable fact patterns.  It suffices to say
that both human dignity and the New England climate counseled here
in favor of a more complete wardrobe.  In addition, the district

-52-

court supportably found that the police neither manipulated the situation nor used Nascimento's dishabille as a pretext to carry out an otherwise impermissible search. Accordingly, the conduct of the police in deciding to dress the suspect falls within the reasonable latitude afforded arresting officers in coping with exigent circumstances. See United States v. Cook, 277 F.3d 82, 86 (1st Cir. 2002) (explaining that "common sense and practical considerations must guide judgments about the reasonableness of searches and seizures").

This brings us to the search itself. The evidence at the suppression hearing indicated that, as a matter of policy, Boston police officers in similar situations allowed arrestees to select the clothes that they wished to wear. The arrestee, however, typically would not be given direct access to the closet. Thus, the question reduces to whether a cabinet eight to ten feet away from an unrestrained suspect can be said to be within the suspect's immediate control. Emphasizing that there were two officers between him and the closet, Nascimento argues that we should answer this question in the negative. To buttress his argument, he calls our attention to United States v. Johnson, 16 F.3d 69 (5th Cir. 1994), modified on rehearing, 18 F.3d 293, in which the Fifth Circuit found that a briefcase some eight feet away from an unrestrained suspect was not under his immediate control. See id. at 70-72. In so

holding, the court stressed that four officers were present in the room. Id. at 71.

In our estimation, Johnson is of little help to Nascimento. There, unlike in the case at hand, the officers "never felt threatened" and never "believed that Johnson was about to destroy evidence." Id. at 72. Despite that mindset, they engaged in "precisely the type of generalized, warrantless search prohibited by Chimel." Id.

This case is a horse of a different hue. The officers were arresting a person whom they knew to have been charged with a crime of violence. Law enforcement officers who embark on perilous duties are not expected to ignore the need for commonsense precautions. And here, in sharp contradistinction to Johnson, the officers targeted their search to the closet, which was about to become the locus of activity. The district court found as a fact that the closet was readily accessible to Nascimento. That finding was not clearly erroneous.

That is game, set, and match. Given the finding of accessibility, the closet (and, thus, the cabinet) was within Nascimento's immediate control.[9] Accordingly, we uphold the district court's ultimate conclusion that the scope of the search was within

---

[9]This result is consistent with our earlier implication that, in a small space such as a 10-foot by 10-foot room, even a handcuffed suspect has a "grab area" covering most of the room. See United States v. Ortiz, 146 F.3d 25, 28 (1st Cir. 1998).

permissible limits.  See <u>Abdul-Saboor</u>, 85 F.3d at 671 (holding an area that is "conceivably accessible" to arrestee to be within his immediate control).  On that basis, the district court appropriately denied the motion to suppress.

**V.**

We need go no further.  Concluding, as we do, the appellants' arguments lack force, we affirm their convictions.  We add only that while this case may venture near the outer edge of conduct encompassed by the RICO statute, Stonehurst's activities do not cross that line.

**Affirmed.**

**— Concurring Opinion Follows —**

**BOUDIN**, **Chief Judge**, **concurring**.    Although several important issues are raised on these appeals, the one of greatest continuing importance concerns RICO's commerce requirement, see 18 U.S.C. § 1962(c) (2000), and the constitutional challenge by the defendants based on United States v. Lopez, 514 U.S. 549 (1995), and United States v. Morrison, 529 U.S. 598 (2000)--the duo itself having been distinguished more recently by Gonzales v. Raich, 545 U.S. 1 (2005).[10]

RICO reaches an enterprise that "affect[s]" interstate commerce, 18 U.S.C. § 1962(c), a term of art usually signifying Congress's intent to regulate to the limit of its Commerce Clause powers.  Circuit City Stores, Inc. v. Adams, 532 U.S. 105, 115 (2001).  In our case, the evidence showed the gang's regular use of guns that had moved in interstate commerce, as well as one trip by a gang member across state lines to procure such weapons.  The guns were not peripheral; they related directly and centrally to the gang's activities.  This nexus is enough to satisfy the Commerce Clause.  That the acquisition of such weaponry swells, rather than impedes, interstate commerce long ago ceased to matter.  United States v. Darby, 312 U.S. 100, 113 (1941).

---

[10]Jones v. United States, 529 U.S. 848 (2000), is also cited along with the Lopez-Morrison duo, but Jones was a statutory interpretation case and did not directly engage the scope of Congress's commerce power.

The commerce link in our case is at least as strong and arguably stronger than that of a prior felon who acquires, in some local "street" transaction, a gun that happened to be made in another state.  The act of a felon receiving or possessing such a gun (or, indeed, even a single bullet) has for many years been a federal criminal offense, see 18 U.S.C. § 922(g)(1), based on the prior movement of the gun in interstate commerce.  Scarborough v. United States, 431 U.S. 563 (1977).  Here, multiple weapons and their use as part of the criminal enterprise were amply proved.  Given Scarborough, our own case appears a fortiori.

Some courts in upholding the felon-in-possession statute assert that it regulates an "instrumentality" of commerce, namely the gun.  E.g., United States v. Dorris, 236 F.3d 582, 586 (10th Cir. 2000).  But in truth the statute criminalizes conduct--possession or receipt of a gun by a felon--and the gun's provenance provides a sufficient nexus to commerce to permit federal regulation of that conduct.  The offending conduct here is the use of guns to kill people as part of a criminal enterprise; and the interstate origins of the guns permit Congress to regulate that conduct.  If Congress can regulate the mere possession of a gun because the gun at one time traveled in interstate commerce, surely it can also regulate an enterprise that uses such guns to kill.

There are other analogous statutes.  The federal car-jacking statute, 18 U.S.C. § 2119 (2000), makes murder and lesser

violence into federal crimes simply because the vehicle once moved in interstate commerce, and it has repeatedly been upheld. E.g., United States v. Cobb, 144 F.3d 319, 320-21 (4th Cir. 1998). And courts regularly uphold wire and mail fraud convictions because a single call or mailing, playing an incidental role in the scheme, creates a link to an instrumentality of interstate commerce, e.g., Schmuck v. United States, 489 U.S. 705, 710-715 (1989); Pereira v. United States, 347 U.S. 1, 8 (1954). In fact, the call or mailing may itself be intrastate so the link is the use of facilities that also serve interstate customers, e.g., United States v. Gil, 297 F.3d 93, 100 (2d Cir. 2002).

Lopez and Morrison concerned statutes that did not require any jury finding that the conduct in the particular case used facilities of interstate commerce or affected such commerce. Lopez, 514 U.S. at 561; Morrison, 529 U.S. at 613. The legality of each statute in these two cases depended on imputing (in Lopez) or upholding (in Morrison) a generalized Congressional determination that a class of primarily local activities taken together had some cumulative effect on commerce, even if individual effects were too small to count. Lopez, 514 U.S. at 563; Morrison, 529 U.S. at 615.

The cumulative impact theory had been well established in commerce clause cases since Wickard v. Filburn, 317 U.S. 111 (1942). In Lopez and Morrison, the Supreme Court restricted the theory to cases of economic activity. Lopez, 514 U.S. at 561; Morrison, 529

-58-

U.S. at 611. But the restriction, which we must assume continues to be good law, has nothing to do with a case where the statute requires and the evidence shows that the defendants themselves had the requisite effect on commerce--here by the purchase and possession of weaponry.

Raich is yet a different kind of problem. Marijuana cultivation taken as a whole is a commercial activity affecting interstate commerce; but the Supreme Court upheld the criminal ban even where marijuana is grown for personal non-economic use and consumed in-state. Its rationale was that Congress could reach cases of this kind because, given the practical difficulties of distinguishing, a ban on such intrastate, noncommercial production was an "essential part of the larger regulatory scheme." Raich, 545 U.S. at 27.

The present case is easier for the government than was Raich. To repeat, the RICO statute requires that the particular enterprise itself affect interstate commerce and a jury, supported by evidence, determined that the enterprise in this case did affect such commerce. The guns traveled in interstate commerce; so too did one of the enterprise's gun purchasers. This is sufficient to pass constitutional muster. Cf. Scarborough, 431 U.S. 563. However much Raich may or may not affect Lopez and Morrison, the convictions in this case satisfy established precedent.

Congress' use of the Commerce Clause to reach local crimes or criminals plausibly linked in the individual case to interstate commerce may or may not be good federalism policy but its legality is too well established to be revisited by the lower federal courts. Conceivably, the link in a particular case may be too slight or faint; every murder is of someone whose next meal might otherwise have come from a large supermarket chain purchasing its products interstate. See Lopez, 514 U.S. at 564. But the arsenal of guns in this case is not a slight or faint connection and is sufficient to sustain federal jurisdiction under existing Supreme Court precedent.