# United States Court of Appeals
## For the First Circuit

Nos. 18-2175, 18-2179, 18-2189, 18-2195

UNITED STATES OF AMERICA,

Appellee,

v.

ROLANDO MILLÁN-MACHUCA, a/k/a Rolo; ROBERTO CASADO-BERRÍOS,
a/k/a Bobe, a/k/a Bobel; MIGUEL RIVERA-CALCAÑO, a/k/a Guelo,
a/k/a Kikirimiau; GIORDANO SANTANA-MELÉNDEZ, a/k/a Viejo Ten,

Defendants, Appellants.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Timothy S. Hillman, U.S. District Judge*]

Before

Lynch, Selya, and Lipez,
Circuit Judges.

Lydia Lizarribar-Masini for appellant Rolando Millán-Machuca.
Jason González-Delgado for appellant Roberto Casado-Berríos.
Maria Soledad Ramirez-Becerra, with whom Maria Soledad
Ramirez-Becerra Law Office was on brief, for appellant Miguel
Rivera-Calcaño.
Anita Hill Adames, with whom Anita Hill Law Office was on
brief, for appellant Giordano Santana-Meléndez.
William A Glaser, Attorney, Appellate Section, Criminal
Division, with whom W. Stephen Muldrow, United States Attorney,

---

* Of the District of Massachusetts, sitting by designation.

Victor O. Acevedo-Hernández, Assistant United States Attorney, District of Puerto Rico, Brian A. Benczkowski, Assistant Attorney General, and John P. Cronan, Principal Deputy Assistant Attorney General, were on brief, for appellee.

March 10, 2021

**LIPEZ**, <u>Circuit Judge</u>.  Appellants Rolando Millán-Machuca, Roberto Casado-Berríos, Miguel Rivera-Calcaño, and Giordano Santana-Meléndez were leaders of La Asociación ÑETA, a Puerto Rico prison organization that distributed large quantities of controlled substances and other contraband throughout several Puerto Rico correctional facilities.  The organization also carried out killings, including the murder of inmate Alexis Rodríguez-Rodríguez.  The four appellants were charged with racketeering and drug trafficking conspiracies; Millán-Machuca was also charged with murder in aid of racketeering.  After an eight-day jury trial, appellants were convicted on all counts.

On appeal, the four appellants challenge the sufficiency of the evidence for their convictions.  Millán-Machuca and Rivera-Calcaño seek a new trial, claiming errors in the admission of certain evidence.  Millán-Machuca, Casado-Berríos, and Rivera-Calcaño challenge the reasonableness of their sentences.  We find these claims meritless and affirm.  Additionally, Rivera-Calcaño claims ineffective assistance of counsel at his sentencing hearing, a claim we do not address on the merits.  Instead, we dismiss this claim without prejudice.

**I.**

Our overview of the facts is primarily drawn from the testimony of the government's witnesses at trial.  Because

appellants appeal, in part, on insufficiency of the evidence grounds, we recount the facts in the light most favorable to the prosecution.  See United States v. Vázquez-Soto, 939 F.3d 365, 368-69 (1st Cir. 2019).

## A. La Asociación ÑETA

In the 1980s, a group of inmates incarcerated in Puerto Rico prisons formed La Asociación ÑETA ("ÑETA"), an organization with the stated purpose of advocating against abuse and injustice within the prison system.  The organization's name stands for "new birth and new beginning."  During its decades-long history, this prisoners' rights group evolved into a prison gang running a sophisticated and highly profitable drug and contraband smuggling scheme.

ÑETA functioned through a strict hierarchical structure. Longtime members who were present at the organization's founding were known as "pillars."  These individuals occupied a unique position of respect.  They did not manage ÑETA's day-to-day operations, but they were consulted for advice and had authority to replace leaders with whom they disagreed.  The primary leaders of the organization were known as the "maximum leadership."  The "maximum leadership" included two leaders ("Leader 1" and "Leader 2"), two advisors ("Advisor 1" and "Advisor 2"), a secretary, a coordinator, and a treasurer.  The next rung in the organizational

ladder was the leadership of each correctional facility or "chapter." ÑETA had chapters in several Puerto Rico prisons, including the facilities at Ponce, Bayamón, Guayama, and Zarzal. Each chapter had two chapter leaders, two advisors, a secretary, a coordinator, and a treasurer. Below the chapter leaders were the "floor leaders," who directly supervised the drug trafficking operation, and "missionaries," who carried out orders from the leadership.

ÑETA members were required to follow a set of rules. A new prisoner could not become a member if he had committed certain crimes, such as child abuse or rape. There could be "no stealing" and "[n]o causing trouble." They were told "[do n]ot look at your fellow inmate's visitors," and "[d]o not abuse the weak." Members were expected to obey leaders or face punishment, including exclusion from the organization or a "beatdown." Failure to obey an order from the maximum leadership was punishable by death.

New members of the organization learned ÑETA rules at "seminars," where longtime members explained the ÑETA organization's history and ideals. One ÑETA rule required "[r]espect [for] the shout of the 30th," a reference to a meeting on the 30th day of each month to give a "battle cry" in honor of ÑETA's founder, who had been killed by a rival prison gang. ÑETA had its own hand signal (placing the middle finger on top of the

index finger) and used the colors blue and white as a sign of membership.

ÑETA trafficked cocaine, heroin, and marijuana into the Puerto Rico prisons through two primary means. First, some drugs were smuggled in by prison visitors, correctional officers, or civilian employees. These drugs were typically concealed in body cavities. Other drugs arrived by "pitch-ins" -- packages that accomplices on the outside literally "pitched" over the prison walls. ÑETA members would then retrieve the drugs from the prison yards and sell the smuggled substances to other inmates. The monetary transactions were handled by individuals outside of the prison, who sent funds by Western Union or MoneyGram transfers to bank accounts controlled by the leaders of ÑETA. For large transactions in excess of $10,000, outside contacts met in person and exchanged cash.

In addition to the drugs controlled directly by the leadership, some members brought in "personal drugs" from their own sources, which they could use and sell outside of the ÑETA organization's operations if they paid a fee to the organization. This payment, known as an "incentive," was $1,200 for 62 grams of heroin, $500 for 62 grams of cocaine, and $400 for a pound of marijuana. ÑETA also smuggled cell phones and charged a monthly

incentive of $20 to $25 to each inmate in possession of a cell phone.

Through civilian smuggling and "pitch-ins," ÑETA trafficked large quantities of controlled substances and other contraband at enormous profit. At the prison in Ponce, ÑETA members introduced about 1.5 kilograms of heroin, one kilogram of cocaine, and 15 to 20 pounds of marijuana each month. In Bayamón, they smuggled in about two kilograms of heroin, 1.5 kilograms of cocaine, and 30 to 35 pounds of marijuana each month. In Guayama, they moved an additional 2.5 kilograms of heroin, 1.5 kilograms of cocaine, and 10 to 15 pounds of marijuana each month. Remarkably, the organization generated six to twelve million dollars in revenue a year, derived both from the organization's own drug distribution and incentives payments.

## B. The Appellants

Each of the appellants was an inmate in a Puerto Rico correctional facility, and each held a high-ranking position in ÑETA's leadership structure. Rolando Millán-Machuca (also known as "Rolo") was the organization's third-in-command as Advisor 1 of the maximum leadership. In this position, he "ha[d] to have knowledge of everything," and "everything ha[d] to go through his hands." He managed the distribution of drugs and was authorized to "give orders to kill." In November 2014, he gave such an order,

calling for the death of inmate Alexis Rodríguez-Rodríguez (also known as "El Loco"). Following this order, a group of ÑETA members murdered Rodríguez-Rodríguez by strangulation and a heroin overdose. At the time of the relevant events, Millán-Machuca's brother, Avelino Millán-Machuca (also known as "Papito"),[1] was Leader 1 of the maximum leadership, the top leader of the entire organization.

Casado-Berríos (also known as "Bobe" or "Bobel") was a chapter leader at the Ponce minimum security prison; later, after he was transferred to the Zarzal prison, he became Papito's "right-hand man," distributing drugs at both Ponce and Zarzal. The heroin and cocaine he distributed with Papito in Zarzal were "personal" drugs that he was permitted to distribute without paying an incentive because of his high rank in the organization.

Rivera-Calcaño (also known as "Guelo" or "Kikirimiau") held various positions in the ÑETA leadership: leader of the "dialog[ue] committee" assigned to talk to the prison administration about inmates' complaints; a chapter leader in a facility at Bayamón; a chapter leader at a Ponce facility; the leader responsible for "collecting the incentives for the drugs

---

[1] We refer to Avelino Millán-Machuca by his commonly used nickname "Papito" to distinguish him from appellant Rolando Millán-Machuca.

for the maximum leadership" at another facility in the Bayamón complex; and "coordinator and secretary" at Zarzal.

Santana-Meléndez (also known as "Viejo Ten") was recognized as a "pillar." In this position, he had the respect of the maximum leadership and the power to replace any of them. Maximum leadership ordered that he receive special privileges, including a twice-daily "dosage" of heroin, and access to the organization's cell phones, canned goods, or cigarettes without paying.

## C. Federal Criminal Proceedings

On May 9, 2016, fifty individuals, including the four appellants, were charged in a multi-count indictment with conspiracy to commit a pattern of racketeering, in violation of 18 U.S.C. § 1962(d), and conspiracy to traffic drugs, in violation of 21 U.S.C. § 846. Millán-Machuca was charged with murder in aid of racketeering in violation of 18 U.S.C. § 1959(a)(1). During an eight-day jury trial in July 2018,[2] correctional officers, police officers, Federal Bureau of Investigation agents, and several inmates testified to the appellants' involvement in these crimes as leaders of ÑETA. Four ÑETA members testified for the

---

[2] A trial that initially began in September 2017 was interrupted by Hurricane Maria. The court declared a mistrial in June 2018 due to the jurors' lack of memory of the testimony and hardships that had arisen for some of the jurors.

government: Alex Miguel Cruz-Santos, Miguel Álvarez-Medina, José González-Gerena, and Osvaldo Torres-Santiago. The appellants did not present any witnesses.

The jury convicted the four appellants of conspiracy to commit racketeering and conspiracy with intent to distribute a controlled substance. Millán-Machuca was also convicted of murder in aid of racketeering. The district court entered judgment against the appellants on November 15, 2018, and sentenced Millán-Machuca to life imprisonment, Casado-Berríos to 180 months of imprisonment, Rivera-Calcaño to 156 months of imprisonment, and Santana-Meléndez to 136 months of imprisonment. Each defendant filed a timely notice of appeal.

In evaluating the appeals, we divide our analysis into three parts: the challenges to the sufficiency of the evidence to support the convictions; the demand for a new trial on the basis of the alleged improper admission of certain evidence; and, finally, the challenges to sentencing.

**II.**

The appellants claim that there was insufficient evidence to support convictions on one or more of the charges against them. We review such challenges de novo, when, as is the case here, the appellants preserved their claims below through motions for acquittal under Rule 29. United States v. Santos-

<u>Soto</u>, 799 F.3d 49, 56 (1st Cir. 2015).  We draw all reasonable inferences from the evidence in the light most favorable to the prosecution.  <u>Id.</u> at 56-57.  Our inquiry focuses on "whether 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"  <u>United States</u> v. <u>Bailey</u>, 405 F.3d 102, 111 (1st Cir. 2005) (quoting <u>United States</u> v. <u>Henderson</u>, 320 F.3d 92, 102 (1st Cir. 2003)).  As we have previously commented, "[d]efendants challenging convictions for insufficiency of evidence face an uphill battle on appeal." <u>United States</u> v. <u>Rodríguez-Martinez</u>, 778 F.3d 367, 371 (1st Cir. 2015) (alteration in original) (quoting <u>United States</u> v. <u>Pagán-Ferrer</u>, 736 F.3d 573, 590 (1st Cir. 2013)); <u>see</u> <u>also</u> <u>United States</u> v. <u>Connolly</u>, 341 F.3d 16, 22 (1st Cir. 2003) ("[W]e will reverse only if the verdict is irrational.").

## A. The Elements of the Charges

### 1. The RICO Conspiracy

All four appellants were convicted of Count One, conspiracy to commit racketeering, in violation of the Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. § 1962(d).  RICO makes it a crime for "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such

enterprise's affairs through a pattern of racketeering activity," or participate in a conspiracy to do so.  Id. § 1962(c)-(d).  The "predominant" elements of a substantive subsection (c) RICO offense are "(1) the conduct (2) of an enterprise (3) through a pattern of racketeering activity."  Salinas v. United States, 522 U.S. 52, 62 (1997).

An "enterprise" is defined as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."  18 U.S.C. § 1961(4).  The enterprise must be one affecting interstate or foreign commerce, but it need only have a de minimis effect on interstate or foreign commerce to demonstrate the required nexus.  United States v. Rodríguez-Torres, 939 F.3d 16, 27 (1st Cir. 2019), Rodriguez-Martinez v. United States, 140 S. Ct. 972 (2020), Sanchez-Mora v. United States, 140 S. Ct. 975 (2020), and Guerrero-Castro v. United States, 140 S. Ct. 2819 (2020).

A pattern of racketeering activity is defined as two or more "racketeering acts" that were related, occur within ten years of one another, and pose a threat of continued criminal activity.  See United States v. Chin, 965 F.3d 41, 47 (1st Cir. 2020). "Racketeering acts" are specific crimes defined by federal law,

- 12 -

including murder and offenses involving drug trafficking.  See 18 U.S.C. § 1961(1)(A).

The appellants are charged with engaging in a RICO conspiracy, rather than with a substantive RICO offense.  See id. § 1962(d) ("It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.").  To prove a defendant's participation in a RICO conspiracy, the government must prove that "the defendant knew about and agreed to facilitate" a substantive RICO offense consisting of the three elements we have described.  United States v. Leoner-Aguirre, 939 F.3d 310, 316 (1st Cir. 2019), cert. denied, 140 S. Ct. 820 (2020).  In other words, "a RICO-conspiracy conviction requires proof that the defendant knowingly joined the conspiracy, agreeing with one or more coconspirators 'to further [the] endeavor which, if completed, would satisfy all the elements of a substantive [RICO] offense.'"  Rodríguez-Torres, 939 F.3d at 23 (alteration in original) (quoting Salinas, 522 U.S. at 65).

The Supreme Court has ruled that a RICO conspiracy conviction does not require the government to prove that the defendant himself committed or agreed to commit two or more racketeering acts.  Salinas, 522 U.S. at 65.  Instead, "the government's burden, as to the 'pattern of racketeering activity' requirement for a RICO conspiracy violation, is to prove that the

- 13 -

defendant agreed that at least two acts of racketeering would be committed in furtherance of the conspiracy."[3] Leoner-Aguirre, 939 F.3d at 317. The government also need not prove that the conspirators agreed to commit two different types of racketeering activity. Rodríguez-Torres, 939 F.3d at 29. Two instances of the same racketeering act meet the definition of a pattern of racketeering activity. Id.

Here, the RICO conspiracy charged in the indictment alleged that appellants conspired to "conduct . . . the affairs of [the] enterprise through a pattern of racketeering activity consisting of multiple offenses involving (1) drug trafficking, including cocaine, heroin and marijuana . . . and multiple acts involving: (2) murder." Thus, as the district court instructed the jury, a defendant is guilty of the charged RICO conspiracy if he "agreed to participate in the conduct of an enterprise with the knowledge that some members would engage in at least two acts of

---

[3] Three of the appellants (Millán-Machuca, Rivera-Calcaño, and Santana-Meléndez) cite United States v. Ramírez-Rivera, 800 F.3d 1 (1st Cir. 2015), in their briefing. As we have previously acknowledged, that opinion's statement that a RICO conspiracy conviction requires that a defendant agreed to commit, or in fact committed, two or more predicate offenses does not reflect the current law of this court. Leoner-Aguirre, 939 F.3d at 317 (discussing Ramírez-Rivera, 800 F.3d at 18). Ramírez-Rivera relied on United States v. Shifman, 124 F.3d 31, 35 (1st Cir. 1997), a case that was abrogated by Salinas.

murder or at least two acts of drug trafficking, or both of them, or any combination of them."

## 2. Drug Trafficking Conspiracy

The four appellants were also convicted of Count Two, which charged a conspiracy to possess with intent to distribute heroin, cocaine, and marijuana in violation of 21 U.S.C. § 846. This charge required the government to prove (1) the existence of a conspiracy to possess heroin, cocaine, and/or marijuana with the intent to distribute it, and (2) that the defendant knowingly and willfully joined in that conspiracy. See id. § 841(a).

## 3. Murder in Aid of Racketeering

As noted, Millán-Machuca was also convicted of Count Four, which charged murder in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(1). This offense consists of four elements: (1) the existence of an enterprise engaged in interstate commerce; (2) that enterprise engaged in "racketeering activity," (3) the defendant committed a crime of violence, here murder, in violation of Puerto Rico law, and (4) that crime of violence was committed as "consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value from an enterprise engaged in racketeering activity, or for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity." 18 U.S.C. § 1959(a).

- 15 -

**B. Rolando Millán-Machuca**

Millán-Machuca challenges the sufficiency of the evidence as to all three of his counts of conviction: the racketeering conspiracy, the drug trafficking conspiracy, and murder in aid of racketeering. We begin our discussion with the latter two convictions because, as we will explain in our review of the RICO conspiracy conviction, the evidence establishing that Millán-Machuca engaged in a drug conspiracy and a murder in aid of racketeering also supports his RICO conspiracy conviction. The three charges are closely intertwined: each stems from his role in the ÑETA maximum leadership.

**1. Drug Trafficking Conspiracy**

Millán-Machuca claims that the drug distribution attributed to ÑETA was managed solely by an individual ÑETA member, Jose Folch-Colon, without involvement from Millán-Machuca personally or ÑETA as an organization. Four ÑETA members testified to the contrary, providing evidence that ÑETA and its leadership, including Millán-Machuca, ran a large drug distribution operation.

The four cooperating witnesses each named Millán-Machuca as Advisor 1 to the maximum leadership and stated that he played a lead role in overseeing the organization's drug trafficking operations. Alex Miguel Cruz-Santos testified that "Millán-Machuca was in charge of [the personal drug fund]. His role is to

- 16 -

supervise . . . what's occurring with the drug[s] and see if it's been paid." Miguel Álvarez-Medina testified that Millán-Machuca was involved in drug trafficking as a member of the maximum leadership and previously as the leader at one of the Ponce facilities. Jose González-Gerena testified that Millán-Machuca gave orders as to "[w]hat comes in, what doesn't come into the jail, the drugs." Osvaldo Torres-Santiago testified that Millán-Machuca "was one of the persons in charge" and that "there was an inmate who sold drugs that belonged to him."

In addition to this testimony, the government provided evidence of recorded phone calls. Millán-Machuca was a participant in a July 22, 2015 phone call in which ÑETA leaders spoke about drug trafficking, including a discussion of "a train about to come in," a reference to drugs, as well as "pitches," one of the primary methods of smuggling drugs into the prison. Millán-Machuca can be heard asking "the thing . . . hasn't it gotten in yet?," to which another member responded, "ours is supposed to come in this week. At least I have one train secured." On the call, Millán-Machuca spoke about the status of "incentives," the payments made to allow inmates to bring personal drugs into the prison. He also discussed details about the roles of different leaders within the organization. Millán-Machuca participated in another call on July

26, 2015, in which ÑETA leaders discussed a "substance sale" and the payment of incentives.

Although Millán-Machuca acknowledges that witnesses testified to his role in ÑETA's drug distribution operation, he attempts to dismiss this testimony as mere "allegation[s]," an argument that gets him nowhere. See, e.g., United States v. Cortés-Cabán, 691 F.3d 1, 14 (1st Cir. 2012) (stating that testimony of a cooperating accomplice can be sufficient to sustain a conviction, even if uncorroborated). The witness testimony, along with the recorded phone calls, provided more than enough evidence to allow the jury to find Millán-Machuca guilty of a drug distribution conspiracy in concert with ÑETA.

### 2. Murder in Aid of Racketeering

To establish the basis for any RICO or Violent Crime in Aid of Racketeering ("VICAR") conviction, the government must establish the existence of an enterprise engaged in interstate commerce and racketeering activity. United States v. Nascimento, 491 F.3d 25, 31-32 (1st Cir. 2007) (applying a single analysis to the sufficiency of proof for these elements to a RICO and a VICAR offense). Millán-Machuca argues that the government did not present sufficient evidence to prove that ÑETA was an "enterprise" pursuant to RICO, a claim which would similarly undermine his VICAR conviction. See id. ÑETA clearly constituted a "group of

individuals associated in fact although not a legal entity," thus meeting the basic definition of an "enterprise" within the meaning of RICO and VICAR. See 18 U.S.C. §§ 1959(b)(2), 1961(4).

Millán-Machuca asserts that ÑETA was not a criminal enterprise, but, rather, a lawful inmates' rights advocacy group that included some members who sold drugs. There was more than enough evidence for a reasonable jury to reject the premise that it was a lawful group that happened to include some members who sold drugs. Furthermore, nothing in the statutory definition of enterprise requires that the enterprise be defined solely by a criminal purpose. Indeed, the Supreme Court has recognized that RICO, and, thus, also VICAR, extends to "both legitimate and illegitimate enterprises." United States v. Turkette, 452 U.S. 576, 580-81 (1981).[4] As we have noted, we analyze VICAR enterprises under the same standard as RICO enterprises. See Nascimento, 491 F.3d at 32.

After establishing the enterprise, the government was required to prove that Millán-Machuca committed a murder in

_____

[4] Millán-Machuca also challenges another element required for both RICO and VICAR offenses: a nexus between the enterprise and interstate commerce. The market for illegal drugs constitutes commerce over which the United States had jurisdiction. Taylor v. United States, 136 S. Ct. 2074, 2081 (2016). Also, Officer Eddie Vidal-Gil testified that cocaine and heroin are not produced in Puerto Rico. Vidal-Gil's testimony was enough to establish the slight effect on interstate commerce that is required for a RICO conviction. See Rodríguez-Torres, 939 F.3d at 27.

violation of Puerto Rico law in aid of the enterprise. As a preliminary matter, we reject appellant's claim that because murder-for-hire is not an offense specifically criminalized by the Puerto Rico Penal Code, it cannot serve as a predicate offense for a murder in aid of racketeering conviction. The lack of a specific murder-for-hire statute does not mean that murder-for-hire is not prohibited by Puerto Rico law. Puerto Rico has a general murder statute that prohibits the intentional killing of a person, P.R. Laws Ann. tit. 33 § 4733 (2004), and that statute plainly applies to the murder alleged here.

On the substantive issue, Millán-Machuca claims that the murder was not authorized by ÑETA at all. Instead, it was a conspiracy planned between two inmates, Folch-Colon and González-Gerena, because of personal rivalries unrelated to ÑETA. This claim ignores the ample evidence presented at trial, which tied ÑETA and Millán-Machuca to the murder.

The primary witness against Millán-Machuca was González-Gerena, the individual who led the attack on Rodríguez-Rodríguez at Millán-Machuca's behest. He testified that Millán-Machuca gave a direct order (referred to as a "directriz") to commit the murder. Only top members of the maximum leadership had the power to give such a directive; as a "missionary," González-Gerena was required to comply or face death himself. He stated that Folch-Colon

requested and paid for the murder. When he did not act immediately, Millán-Machuca and Folch-Colon called him and "asked [him] to give an explanation on why [he] hadn't done that yet." González-Gerena described how he, along with three others (including Torres-Santiago), committed the murder, first by attempting to cause a heroin overdose. When that failed, they strangled Rodríguez-Rodríguez with a sheet and then injected him with heroin. González-Gerena stated that he and Millán-Machuca were paid by Folch-Colon for committing the murder.

Torres-Santiago, another participant in the murder of Rodríguez-Rodríguez, corroborated González-Gerena's testimony. He testified that Millán-Machuca had approached him and asked him if he wanted to kill Rodríguez-Rodríguez as retribution for the murder of Torres-Santiago's brother, for which he believed Rodríguez-Rodríguez was responsible. Torres-Santiago added that he had learned from another inmate that Folch-Colon had "convinced the maximum leadership, meaning Rolando [Millán-Machuca] to pay them to kill Alexis 'El Loco' [Rodríguez-Rodríguez]." Folch-Colon then paid both Millán-Machuca and González-Gerena for the murder. Additionally, a third witness, Cruz-Santos, testified to multiple conversations with other ÑETA leaders in which he was told that Millán-Machuca ordered the killing of Rodríguez-Rodríguez. This evidence demonstrates a murder-for-hire ordered by Millán-Machuca

in his capacity as a leader of ÑETA, not a crime planned solely by Folch-Colon and González-Gerena.

Taking another tack, Millán-Machuca argues that there was no evidence that the murder was committed "for the purpose of gaining entrance to or maintaining or increasing position in [the] enterprise," as required by 18 U.S.C. § 1959(a). To meet the elements of a murder in aid of racketeering conviction, the government must show that the defendant acted with such a purpose, and we have previously recognized that the statute does not require that the government prove this was "the sole purpose." United States v. Brandao, 539 F.3d 44, 56 (1st Cir. 2008). In the context of a trial with hours of testimony about ÑETA and Millán-Machuca's leadership role, the jury could rationally conclude that he acted, at least in part, to strengthen and maintain his position in the leadership. See, e.g., id. (stating that the "question of motive under VICAR was for the jury to resolve" where there was evidence of both personal and gang-related motivations).

### 3. RICO Conspiracy

We return to the RICO conspiracy. As we have noted, this conviction required the government to prove that Millán-Machuca "agreed to participate in the conduct of an enterprise with the knowledge that some members would engage in at least two acts of murder or at least two acts of drug trafficking, or both

of them, or any combination of them."  As we described in our discussion of the evidence of the murder in aid of racketeering offense, the government presented ample evidence that ÑETA was an enterprise as defined by VICAR and RICO, and that Millán-Machuca agreed to participate in that enterprise.  And as we described in our discussion of the evidence supporting both the drug conspiracy and the murder in aid of racketeering charges, the government presented overwhelming evidence that, in his role in the ÑETA maximum leadership, Millán-Machuca participated in dozens of drug offenses and a murder.  This evidence far exceeds the evidence required to show participation in a RICO conspiracy, which merely requires that Millán-Machuca agreed to participate in ÑETA with the knowledge that some members would engage in at least two acts of drug trafficking and/or murder.[5]  Here, the evidence demonstrated that Millán-Machuca participated in the predicate acts himself.  The jury supportably convicted Millán-Machuca of all three charges.

---

[5] Millán-Machuca also argues that the government did not prove a RICO conspiracy because it alleged three types of racketeering acts -- drug trafficking, murder, and bribery -- but failed to present evidence of bribery.  The abandonment of the bribery claim has no bearing on the sufficiency of the evidence because a pattern of racketeering activity requires only two racketeering acts.

## C. Roberto Casado-Berríos

Casado-Berríos challenges the sufficiency of the evidence as to his knowing and willful participation in the RICO and drug trafficking conspiracies. He argues that the evidence only shows that he associated with participants in the drug trafficking conspiracy, not that he was a participant himself. Such an association, without more, would not be enough to convict on either charge. See, e.g., United States v. Gonzalez, 570 F.3d 16, 23 (1st Cir. 2009). But his claims of mere association are contradicted by the record, which reveals that he was a participant in the drug trafficking conspiracy and a leader who acted in furtherance of ÑETA's goals.

Two ÑETA leaders who knew Casado-Berríos personally testified to his leadership role in the drug trafficking operation. The first, Cruz-Santos, stated that Casado-Berríos managed personal drugs, specifically heroin, at the Zarzal facility. He further testified that before Casado-Berríos was transferred to Zarzal, he was a chapter leader at the Ponce minimum security facility. The second, González-Gerena, also testified that Casado-Berríos distributed drugs at Zarzal. He described Casado-Berríos as the "right-hand man" of Papito, Leader 1 of the maximum leadership. The two men controlled all drug trafficking at Zarzal. González-Gerena explained, "[N]o drugs could go in there or no

drugs could be sold because the drugs that were going through there belonged to Papito and Bobe [Casado-Berríos]." Cruz-Santos also stated that, on one occasion, Casado-Berríos had called him and "ask[ed] him to get two-eighths [of drugs] to introduce it into Zarzales."

Cruz-Santos's and González-Gerena's testimony was corroborated by the testimony of two other ÑETA members who did not know Casado-Berríos personally but knew of his role in the organization from the remarks of others.[6] Álvarez-Medina testified that he had heard from other ÑETA members that Casado-Berríos "managed" heroin "together with Papito Machuca [at the facility in Zarzal]." He stated, "[I]n Zarzales[7] the only drugs that are there are from Papito and Bobe [Casado-Berríos]." Torres-Santiago similarly testified that Casado-Berríos "was one of the only ones that could sell drugs in Zarzales."

This testimony permitted a rational jury to conclude that Casado-Berríos was an active and knowing participant in the drug trafficking conspiracy. Furthermore, for the reasons we have explained, this testimony would allow the jury to find that Casado-

---

[6] The court admitted this testimony on the basis of the hearsay exception for the statements of co-conspirators. See Fed. R. Evid. 801(d)(2)(E). The admission of testimony as statements of co-conspirators was not challenged on appeal.

[7] Witnesses refer to this particular Puerto Rico prison facility as both "Zarzal" and "Zarzales."

Berríos knowingly participated in the conduct of the ÑETA enterprise and that he agreed that he or his co-conspirators would commit hundreds of drug offenses. As such, this evidence far exceeds the showing required for a RICO conspiracy conviction.

### D. Miguel Rivera-Calcaño

Rivera-Calcaño's argument follows the same logic as the argument posed by Casado-Berríos: he merely associated with members of the conspiracies rather than participating in them. As was the case with our discussion of the sufficiency claim of Casado-Berríos, we can address the sufficiency of the evidence of participation in both conspiracies by recounting the evidence of Rivera-Calcaño's participation and leadership in ÑETA's drug trafficking scheme, a key part of the conduct of the RICO enterprise.

The government's cooperating witnesses testified that Rivera-Calcaño had far more than just an association with members of the drug trafficking conspiracy. Álvarez-Medina, who was incarcerated with Rivera-Calcaño several times and knew him personally, testified that Rivera-Calcaño "was in different roles." Although he was a leader of the dialogue committee, a group of ÑETA members engaged in inmates' rights advocacy, he also had leadership roles in the drug trafficking operation. He was a chapter leader at Ponce 1000, where he "organized and got the jail

in order to be able to do the [drug] transactions and take them from module to module." When Rivera-Calcaño was transferred to Bayamón 1072, he acted as Leader 2 of that facility. In that role, "he would collect drugs, cigarettes or canned goods." At Bayamón 448, he "collect[ed] the incentives for the drugs."

González-Gerena testified that Rivera-Calcaño was the "coordinator and secretary" at Zarzal. In that role, he called chapter leaders to "check on . . . how are the finances, how are the funds, talk to leadership of the population, what went in, what didn't go in of the drugs, how many phones went in." He passed this information on to Papito. Rivera-Calcaño also coordinated meetings with the maximum leadership.

The witness testimony was corroborated by recorded phone calls. On a July 25, 2015 call, Rivera-Calcaño spoke with members of the maximum leadership about drug transactions. The call included references to incentives, two bags paid for by a Western Union money transfer, and a notebook where drug transactions were recorded. He told another leader about an inmate who "st[ole] 10 lines of heroin and four of cocaine and three of those belonged to the fund." On another call, Rivera-Calcaño discussed a "substance sale" and someone who "tried to collect a false Western [Union money transfer]." The witness testimony, corroborated by these

phone calls, was more than enough evidence to sustain a conviction for both the drug trafficking and RICO conspiracies.

### E. Giordano Santana-Meléndez

In a familiar refrain, Santana-Meléndez claims that the evidence presented at trial only proved his association with ÑETA, and not his participation in the RICO conspiracy. Santana-Meléndez argues that as a "pillar" he only had a symbolic, historical role in ÑETA. Again, there was ample evidence to the contrary.

Each of the four cooperating witnesses testified that, as a pillar, Santana-Meléndez was an active and influential leader of the organization. Cruz-Santos testified that Santana-Meléndez had the power to "take out" a maximum leader "if he saw anything that was wrong," and could give orders to other ÑETA members, including maximum leaders. González-Gerena similarly testified that Santana-Meléndez had the power to remove a leader and could do so "whenever he wanted." Álvarez-Medina testified that Santana-Meléndez's "voice and his vote counted in the association," and specifically with the maximum leadership. González-Gerena testified that Santana-Meléndez was consulted regarding "[a]ny problems that are in the state prisons that are serious." González-Gerena had personally been present during such a consultation. Torres-Santiago testified that Santana-Meléndez "had the power to change any decision."

The testimony also indicated that Santana-Meléndez carried out his leadership role with knowledge of the group's illegal activities, including drug trafficking and murder. As three witnesses testified, he received compensation from the organization's drug trafficking proceeds. Cruz-Santos explained that Papito instructed him to take $200-300 from the funds gathered through cell phone incentives and buy heroin to provide to Santana-Meléndez in a twice-daily dosage. Papito told Cruz-Santos that Santana-Meléndez "couldn't want for anything." Álvarez-Medina testified that Santana-Meléndez was "paid with substances, cellular phones, canned goods, [and] cigarettes." Torres-Santiago testified that Santana-Meléndez was given a monthly "salary," which came from money belonging to ÑETA, earned by "[s]elling drugs, selling heroin, marijuana, cocaine, selling phones, and also the money earned for contract killings." Given Santana-Meléndez's well-established leadership role, a jury could rationally conclude that he received these benefits because of his active participation in the affairs of the organization.

The government also presented evidence that Santana-Meléndez not only knew about the murder of Rodríguez-Rodríguez, but counseled the murderer afterwards. González-Gerena testified that after he committed the murder, he informed Santana-Meléndez about what he had done. Santana-Meléndez responded by telling him

"to be calm" because the order came from Millán-Machuca. This testimony, combined with the evidence that Santana-Meléndez had power and influence to control the activities of the organization, would allow the jury to reasonably infer that Santana-Meléndez had knowledge that ÑETA was engaged in murder.

Santana-Meléndez argues that all of this evidence was insufficient to prove that he personally agreed to commit or committed two racketeering acts. As we have already explained, his argument is premised on a misunderstanding of the law, which merely requires that the government prove that "the defendant agreed that at least two acts of racketeering would be committed in furtherance of the conspiracy." Leoner-Aguirre, 939 F.3d at 317; see also Salinas, 522 U.S. at 65. Santana-Meléndez is improperly faulting the government for failing to prove his personal agreement to participate in predicate acts of the conspiracy -- proof that is not required. The copious evidence of Santana-Meléndez's leadership role in ÑETA demonstrates his agreement to participate in the ÑETA enterprise with the knowledge that some members would engage in many acts of drug trafficking. The record also would allow the jury to conclude that he acted in furtherance of the enterprise with knowledge that co-conspirators committed an act of murder. This evidence supports both the drug trafficking and RICO conspiracy convictions.

Millán-Machuca and Rivera-Calcaño seek a new trial, claiming the improper admission of certain evidence. Such claims are evaluated for abuse of discretion when, as is the case here, the appellant objected to the evidence at trial. See United States v. Walker, 665 F.3d 212, 228 (1st Cir. 2011).

**A. Millán-Machuca**

At trial, the judge permitted government witness Torres-Santiago to testify, over Millán-Machuca's objection, that Millán-Machuca had told him about three prior murders he had committed in prison. The testimony included the gruesome detail that Millán-Machuca "tore the heart out of the inmate and started playing with the heart as if it was a ball." Appellant argues that all of this evidence was inadmissible under Federal Rule of Evidence 404(b) as prior bad act evidence intended to show a propensity to commit murder and inadmissible under Rule 403 as unduly prejudicial.

Federal Rule of Evidence 404(b)(1) prohibits the use of evidence of a prior bad act "to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." But such evidence is permitted "for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2). Torres-Santiago's

testimony about Millán-Machuca's prior murders was permitted by this exception. The fact that Millán-Machuca brazenly bragged about committing multiple acts of murder to a lower-level ÑETA member shows that he was a powerful and feared leader of the organization. He used intimidation tactics to maintain his position and to ensure compliance with his orders. Such evidence bolsters the inference that Millán-Machuca ordered the murder of Rodríguez-Rodríguez "for the purpose of . . . maintaining . . . [his] position in an enterprise engaged in racketeering activity" under the VICAR count. 18 U.S.C. § 1959(a).

As noted, Federal Rule of Evidence 403 allows the trial court to exclude relevant evidence if "its probative value is substantially outweighed" by, inter alia, "unfair prejudice." The term "unfair prejudice" usually refers to "evidence that invites the jury to render a verdict on an improper emotional basis." United States v. Varoudakis, 233 F.3d 113, 122 (1st Cir. 2000); see also Old Chief v. United States, 519 U.S. 172, 180 (1997) ("The term 'unfair prejudice,' as to a criminal defendant, speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged."). Appellate courts "afford[] considerable deference to a district court's balancing act" under Rule 403. United States v. Guzmán-Montañez, 756 F.3d 1, 7 (1st

Cir. 2014); see also United States v. Raymond, 697 F.3d 32, 38 (1st Cir. 2012) (stating that the Rule 403 balancing test is "best performed by the trial judge, who has an intimate familiarity with the ebb and flow of the case and with its nuances").

Millán-Machuca argues unfair prejudice because the government offered no prison records or other proof indicating that any of the murders actually occurred, and there was no information about the date of the murders, the identity of the victims, or the motivations behind the killings. In his view, the absence of this information substantially reduced the probative value of the evidence of the prior murders. If so, the district court correctly ruled that these omissions could be addressed through cross-examination and did not require exclusion of the evidence.

The admission of the gruesome detail that Millán-Machuca "tore the heart out of the inmate and they started playing with the heart as if it was a ball" presents a closer question. See, e.g., Varoudakis, 233 F.3d at 122 (advising "cautio[n] where the prior act is a 'shocking or heinous crime likely to inflame the jury'" (quoting United States v. Moccia, 681 F.2d 61, 64 (1st Cir. 1982))); United States v. Gilbert, 229 F.3d 15, 24-25 (1st Cir. 2000) (affirming exclusion of evidence under Rule 403 that the defendant had previously attempted to murder her husband in part

because that prior act evidence was "particularly inflammatory" and "undeniably explosive").

We need not decide this close question because if there was any error, it was harmless in the context of the totality of the evidence. See United States v. Arias-Montoya, 967 F.2d 708, 714 (1st Cir. 1992). As detailed above, there was overwhelming evidence of Millán-Machuca's guilt. Four witnesses testified consistently that he was Advisor 1 of the ÑETA maximum leadership, and that he oversaw drug trafficking. That testimony was corroborated by recorded phone calls in which Millán-Machuca can be heard discussing drug distribution. The two witnesses who participated in the murder of Rodríguez-Rodríguez testified that they did so on Millán-Machuca's orders, and a third witness corroborated this claim. There is no reasonable probability that the jury verdict was influenced by this one detail in the defendant's account of his prior murders. See United States v. Hicks, 575 F.3d 130, 143 (1st Cir. 2009) ("[A]n error is harmless if it is 'highly probable that the error did not influence the verdict.'" (quoting United States v. Roberson, 459 F.3d 39, 49 (1st Cir. 2006))).

## B. Rivera-Calcaño

### 1. Controlled Substances

The court admitted into evidence cocaine, heroin, and marijuana seized at the Ponce, Bayamón, and Zarzal prisons.[8] Rivera-Calcaño argues that these drugs were irrelevant because there was no connection established between ÑETA and the drugs. To the contrary, the testimony of the correctional officers who found the drugs showed probable ties to ÑETA. The cocaine was discovered at Ponce in an "area [that] was being worked by ÑETA inmates who were in charge of the cleaning of the complex." The heroin at Ponce was found in a box with the nicknames of ÑETA members written on it. The marijuana at Bayamón was recovered in a housing unit designated for ÑETA members. The marijuana at Zarzal was found in a perimeter area where ÑETA inmates were known to receive "pitch-ins" of drugs thrown over the fence. Thus, the drugs themselves were relevant proof of the racketeering and drug trafficking conspiracies at hand.[9]

---

[8] In his opening brief, Rivera-Calcaño objects to the admission of photos of drugs. The government's response clarifies that the drugs themselves were admitted into evidence, not photos of the drugs. In his reply, Rivera-Calcaño acknowledges that the evidence admitted was the substances themselves.

[9] Rivera-Calcaño further asserts unpersuasively that the drugs should have been excluded from evidence as unfairly prejudicial. There was nothing inflammatory about the drug evidence.

## 2. Summary Chart

The district court permitted the government to display to the jury during closing argument a chart summarizing the amounts of drugs ÑETA trafficked. Although the government's chart initially included four pages, the court excluded the last page after reviewing the testimony. The court gave a detailed instruction regarding the chart, stating:

> [The prosecutor] is going to use [summary charts] in an effort to help explain the facts and the evidence in the light that he sees it in. These charts are not evidence, and if they don't correctly reflect what you think the evidence is, then you should not accept them. However, we do allow them as an aide in helping you understand the evidence, if you choose.

Rivera-Calcaño objects to the purported admission of the summary chart evidence, but the chart was not admitted into evidence. As the judge clearly instructed the jury, the summary chart was not evidence. It was simply used appropriately by the prosecution in closing argument to present "information already in evidence." United States v. Young, 955 F.2d 99, 109 (1st Cir. 1992). Finally, Rivera-Calcaño claims the chart did not correctly summarize the evidence, yet he points to no examples of error.

## IV.

Three of the appellants, Millán-Machuca, Casado-Berríos, and Rivera-Calcaño, challenge the procedural and substantive

reasonableness of their sentences. Our review is bifurcated. We first consider procedural reasonableness before turning to substantive reasonableness. United States v. Arsenault, 833 F.3d 24, 28 (1st Cir. 2016). We review the district court's findings of fact for clear error and consider its interpretation of the sentencing guidelines de novo. United States v. Flores-Machicote, 706 F.3d 16, 20 (1st Cir. 2013).

A sentence is procedurally unreasonable if the court committed a procedural error "such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the [18 U.S.C.] § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence." Gall v. United States, 552 U.S. 38, 51 (2007). A sentence is substantively unreasonable only if it lacks "a plausible sentencing rationale" or "a defensible result." United States v. Martin, 520 F.3d 87, 96 (1st Cir. 2008).

We review unpreserved challenges to the procedural reasonableness of a sentence under the plain error standard. United States v. Duarte, 246 F.3d 56, 60 (1st Cir. 2001). To prevail under plain error review, an appellant must demonstrate: "(1) that an error occurred (2) which was clear or obvious and which not only (3) affected the defendant's substantial rights,

but also (4) seriously impaired the fairness, integrity, or public reputation of judicial proceedings."  Id.

## A. Millán-Machuca

Millán-Machuca claims that the court committed a procedural error by treating the murder of Rodríguez-Rodríguez as first-degree murder.  He did not preserve an objection to the procedural reasonableness of his sentence and thus, as he concedes, this claim is subject to plain error review.

The court calculated Millán-Machuca's guideline sentencing range using the racketeering guideline under the United States Sentencing Guidelines ("USSG"), which instructs the court to apply "the offense level applicable to the underlying racketeering activity."  See USSG § 2E1.1(a)(2); see also USSG §§ 3D1.2-3D1.3 (instructing courts to generally group similar counts together and apply the offense level applicable to the most serious count).  The "underlying racketeering activity" at issue was the murder of Rodríguez-Rodríguez.  Thus, the court applied the first-degree murder base offense level of 43.  USSG § 2A1.1(a).

Millán-Machuca argues that, pursuant to the Puerto Rico Penal Code, the murder-for-hire offense underlying his VICAR conviction qualified only as second-degree murder, not first-degree murder. See P.R. Laws Ann. tit. 33, § 4734(a) (2004).  The distinction between first- and second-degree murder is significant

in sentencing because it alters the USSG calculation.[10]  Millán-Machuca raised a similar argument in an attempt to negate his murder in aid of racketeering conviction altogether.  See supra Section II.B(2).  As we explained above, the murder of Rodríguez-Rodríguez was undoubtedly premeditated, and thus qualifies as first-degree murder under Puerto Rico law.  See id.; P.R. Laws Ann. tit. 33, § 4734 (2004).

Moreover, Millán-Machuca's emphasis on Puerto Rico law is misplaced.  The Guidelines require the court to apply "the offense level corresponding to the most analogous federal offense."  USSG § 2E1.1(a)(2) cmt. n.2 (emphasis added).  The most analogous federal offense is murder within the special maritime and territorial jurisdiction of the United States, in violation of 18 U.S.C. § 1111(a).  Section 1111(a) states that any "willful, deliberate, malicious, and premeditated killing . . . is murder in the first degree."  18 U.S.C. § 1111(a).  There can be no doubt that the murder of Rodríguez-Rodríguez fits this description.

Millán-Machuca also briefly claims that his sentence is substantively unreasonable.  He merely states, "There is no 'plausible explanation' to support the sentence."  Millán-Machuca

---

[10] The USSG first-degree murder guideline "applies in cases of premeditated killing," and carries a base offense level of 43. USSG § 2A1.1 cmt. n.1.  The second-degree murder guideline applies to all other murders and carries a base offense level of 38.  Id. § 2A1.2.

was sentenced to three concurrent life imprisonment terms. On each of his three offenses, the guideline range included life imprisonment. A finding that a sentence was substantively unreasonable is "particularly unlikely when . . . the sentence imposed fits within the compass of a properly calculated [guidelines sentencing range]." United States v. Reyes-Gomez, 927 F.3d 9, 12 (1st Cir. 2019) (alterations in original) (quoting United States v. Ruiz-Huertas, 792 F.3d 223, 228-29 (1st Cir. 2015)). Moreover, Millán-Machuca's conviction for murder in aid of racketeering carries a mandatory life sentence. 18 U.S.C. § 1959(a)(1). There is nothing unreasonable about imposing the sentence required by law.

## B. Casado-Berríos

Casado-Berríos claims that the district court committed procedural errors in his sentencing by adding a leadership role enhancement and by failing to make a specific drug quantity finding. He asserts, incorrectly, that he preserved these two objections for review. As evidence of his objections, he points to two pages in his sentencing memorandum and two pages in the sentencing transcript. Neither contains any objection to either the leadership role enhancement or the drug quantity determination. At the sentencing hearing, Casado-Berríos disclaimed any objection. When asked if he agreed with the Pre-

Sentence Report's ("PSR") guidelines calculations, defense counsel replied, "[W]e have our reserv[ations] regarding the adjustment of role in the offense, but taking into consideration that there might be some evidence that would support it, we did not formally object to it with the probation officer." This vague statement does not preserve an issue for review. Instead, it shows that Casado-Berríos declined to make an objection. Thus, his two claims are subject to plain error review.

Casado-Berríos argues that the court erred in adopting the PSR's four-level increase for his leadership role in the offense. The USSG requires a four-level increase to the base offense level "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." USSG § 3B1.1(a). A three-level increase applies "[i]f the defendant was a manager or supervisor (but not an organizer or leader)" of the same kind of activity. Id. § 3B1.1(b). In deciding whether one of these two subsections applies to a defendant, the Sentencing Commission instructs courts to consider factors including, but not limited to,

> the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal

- 41 -

activity, and the degree of control and authority exercised over others.

Id. § 3B1.1 cmt. n.4; see also United States v. Aguasvivas-Castillo, 668 F.3d 7, 15 (1st Cir. 2012) (describing this list of factors as "non-exhaustive").

The court did not err in applying the four-level leadership adjustment. The conspiracy at issue here clearly involved more than five participants. It is also clear from the witness testimony that Casado-Berríos acted as a leader. He was described as a chapter leader, a "right-hand man" to Papito, and a manager of heroin distribution. There was testimony that Casado-Berríos benefited from his leadership role because he was allowed to "manage [his] own personal drugs, and not even pay an incentive." The district court had an ample basis for finding that Casado-Berríos was a leader, rather than a manager or supervisor, or a lower-level participant.[11]

The guideline sentencing ranges for controlled substance offenses are determined primarily by the drug quantity for which the defendant is responsible. A base offense level is assigned in

---

[11] Even if the court applied the three-level manager or supervisor enhancement, rather than the four-level leader or organizer enhancement, the guidelines calculation would be the same. Casado-Berríos's offense level amounted to 44, which the USSG treats as an effective offense level of 43. USSG § 5A cmt. n.2. An increase of three levels rather than four would not have changed the effective offense level.

accordance with a chart that states drug quantity thresholds which trigger different base offense levels. USSG § 2D1.1(a)(5)(c). Casado-Berríos was assigned a base offense level of 38, which applies to controlled substance offenses involving a quantity equal to or exceeding, inter alia, 90 kilograms of heroin, 450 kilograms of cocaine, 90,000 kilograms of marijuana, or 90,000 kilograms of "converted drug weight."[12]  Id. § 2D1.1(c)(1).

In cases involving a drug trafficking conspiracy, the sentencing court must "make an individualized finding as to drug amounts attributable to, or foreseeable by, th[e] defendant." United States v. Colón-Solís, 354 F.3d 101, 103 (1st Cir. 2004). The court makes that finding based on a preponderance of the evidence standard.  United States v. Vázquez-Larrauri, 778 F.3d 276, 291 (1st Cir. 2015).  The court may consider "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and [] in the case of a jointly undertaken criminal activity . . . all acts and omissions of others that were . . . reasonably foreseeable in connection with that criminal activity."  USSG § 1B1.3(a)(1).  The

---

[12] Converted drug weight, previously known as marijuana equivalency, relies on a chart converting quantities of controlled substances into a standard measurement, such that a sentencing court may "convert each of the drugs to its converted drug weight, add the quantities, and look up the total in the Drug Quantity Table to obtain the combined offense level."  USSG § 2D1.1 cmt. n.8(B).

court may not "automatically" apply the drug quantity attributable to the conspiracy as a whole to one individual defendant. Colón-Solís, 354 F.3d at 103.

The evidence before the district court at sentencing demonstrated that Casado-Berríos was individually responsible for 472,495.63 kilograms of converted drug weight, the full quantity of drugs attributed to the conspiracy. Based on the testimony of González-Gerena, the probation officer calculated that ÑETA sold 252 kilograms of cocaine, 420 kilograms of heroin, and 4,620 pounds of marijuana in three prisons over the course of the conspiracy. This quantity converts to 472,495.63 kilograms of converted drug weight, an amount exceeding the 90,000 kilogram threshold for a base offense level of 38. USSG § 2D1.1(c)(1). As we have just described, Casado-Berríos was a high-level leader in ÑETA. He was an active participant in and supervisor of large-scale drug trafficking. While it is not appropriate to automatically assign the quantity trafficked by a conspiracy to an individual participant, it was reasonable under these circumstances to attribute the full 472,495.63 kilograms of converted drug weight to Casado-Berríos. Such a finding follows inexorably from the conclusion that he was a high-level leader of the conspiracy.[13]

---

[13] The district court did not state explicitly that it was holding Casado-Berríos responsible for the entirety of the drugs distributed by ÑETA during the period of the conspiracy. Given

## C. Rivera-Calcaño

### 1. Ineffective Assistance of Counsel

Rivera-Calcaño claims that he was denied his Sixth Amendment right to counsel at his sentencing hearing. He cites counsel's failure to meet with him before the hearing and counsel's lack of preparation for sentencing. At the hearing, defense counsel stated that his communication with his client had broken down, and he would be providing ineffective assistance if the court went through with the sentencing hearing without either assigning new counsel or granting a continuance. After some probing by the court, it concluded that defense counsel was adequately prepared, and proceeded with the hearing.

It is our usual practice to dismiss ineffective assistance claims on direct appeal, preferring that those claims be heard on collateral review. United States v. Brown, 945 F.3d 597, 605 (1st Cir. 2019). We decide ineffective assistance claims on direct appeal only "[i]n the exceptional case . . . where the record is sufficiently developed, and critical facts are not in

_____

that our circuit precedents emphasize that the sentencing court should state the specific drug quantities attributable to the members of a drug trafficking conspiracy, see United States v. Escobar-Figueroa, 454 F.3d 40, 53 (1st Cir. 2006) (citing Colón-Solís, 354 F.3d at 103), it would have been a better practice for the court to state its finding explicitly. But that finding is unmistakable in the court's explanation of its sentencing decision.

dispute." United States v. Ofray-Campos, 534 F.3d 1, 34 (1st Cir. 2008).

Rivera-Calcaño does not present such an exceptional case. While the question of ineffective assistance of counsel was raised at the sentencing hearing, there was no formal motion and the district court did not develop the record. The significance of the communication breakdown and the adequacy of counsel's preparation for the sentencing hearing are questions of fact best addressed by the district court. See, e.g., United States v. Moran, 393 F.3d 1, 10-11 (1st Cir. 2004). Thus, we dismiss Rivera-Calcaño's ineffective assistance of counsel claim without prejudice to renewal in a habeas petition.

## 2. Reasonableness of the Sentence

Rivera-Calcaño challenges his sentence as procedurally unreasonable because of the same leadership enhancement determination challenged by Casado-Berríos. He also claims that the district court should have decreased his criminal history category because of the nonviolent nature of his crimes. He further challenges his sentence as substantively unreasonable.

Rivera-Calcaño objected to the four-level increase for a leader or organizer role at his sentencing hearing, and thus we review for clear error. Although he argues that he was a leader in ÑETA's prisoners' rights advocacy, but not in the drug

trafficking or any other illegal operations, there was substantial evidence that he played a leadership role in the drug trafficking operation. He was a chapter leader at Ponce, "Leader 2" at Bayamón, and the "coordinator and secretary" for the maximum leadership. In those roles, he collected incentives for the maximum leadership and supervised the finances of other chapters. The district court did not commit clear error in concluding from that evidence that he was a leader or organizer.[14]

Rivera-Calcaño also challenges the district court's finding that his criminal history placed him in Criminal History Category ("CHC") IV. He claims that a CHC of IV overrepresents his criminal history, which was nonviolent and driven by drug addiction. The USSG authorizes a downward departure from the applicable CHC "[i]f reliable information indicates that the defendant's criminal history category substantially overrepresents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes." USSG § 4A1.3(b)(1).

Contrary to Rivera-Calcaño's argument, the court did consider the nonviolent nature of his criminal history and his drug addiction when deciding his sentence. The court explicitly

---

[14] As was the case with Casado-Berríos, a finding that Rivera-Calcaño was a manager or supervisor, rather than a leader or organizer, would not change his guideline sentencing range.

acknowledged that "his prior criminal history . . . does not include violent behavior" and his "offenses are clearly linked to his drug dependence." On this basis, the court granted a substantial downward variance, from the USSG recommendation of life imprisonment to a sentence of 156 months. Moreover, the CHC reduction Rivera-Calcaño claims he is entitled to would not have affected his guidelines range. His offense level was 43. At that level, the recommended sentence is life regardless of the CHC. See USSG § 5A (sentencing table). It was both within the court's discretion, and to Rivera-Calcaño's benefit, to address the mitigating factors through a downward variance in the ultimate sentence rather than a decreased criminal history categorization.

For similar reasons, the sentence was not substantively unreasonable. The sentence reflects a significant downward variance, considering Rivera-Calcaño's history and circumstances. We rarely find a below-guidelines sentence to be substantively unreasonable. See, e.g., United States v. King, 741 F.3d 305, 310 (1st Cir. 2014). This occasion is not that rare instance. Rivera-Calcaño only argues that the sentence is "greater than necessary for . . . a longtime prisoner addicted to heroin who had continuously served more than 30 years in prison for the non-violent crimes resulting from his addiction." Again, the court took those factors into account in making a downward variance. It

was not an abuse of discretion for the court to decide that a 156-month sentence was necessary.

Affirmed.  Rivera-Calcaño's claim for ineffective assistance of counsel is dismissed without prejudice.